NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11959


EMMA GYULAKIAN  vs.  LEXUS OF WATERTOWN, INC., & another.[1]



Middlesex.      March 10, 2016. - August 24, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk, JJ.[2]



Employment, Sexual harassment.  Anti-Discrimination Law, Sex, Attorney's fees.  Practice, Civil, Judgment notwithstanding verdict.  Damages, Punitive.



Civil action commenced in the Superior Court Department on January 10, 2013.

The case was tried before Kimberly S. Budd , J., and postverdict motions for relief were considered by her.

The Supreme Judicial Court granted an application for direct appellate review.


Robert S. Mantell (Lori A. Jodoin with him) for the plaintiff.
Christopher J. Sullivan (Tory A. Weigand with him) for the defendants.

_____

[1] Post Motors, Inc., doing business as Lexus of Watertown.

[2] Justice Cordy participated in the deliberation on this case and authored this opinion prior to his retirement. Justices Spina and Duffly participated in the deliberation on this case prior to their retirements.

The following submitted briefs for amici curiae:

Rebecca Pontikes, Katherine Skubecz, Michaela C. May, & Chetan Tiwari for Massachusetts Employment Lawyers Association & others.

Afton M. Templin for Women's Bar Association of Massachusetts.

Ben Robbins & Martin J. Newhouse for New England Legal Foundation & another.

Elizabeth S. Dillon for Massachusetts Defense Lawyers Association.

CORDY, J.  In December, 2014, a jury rendered a verdict in favor of the plaintiff, Emma Gyulakian, finding that she had been subjected to a sexually hostile or offensive work environment, in violation of G. L. c. 151B (c. 151B), § 4 (§ 4).[3] The jury, having heard evidence tending to establish that Gyulakian suffered relentless sexual harassment by her direct supervisor, Emmanuel Ferreira, found that the defendants, Lexus of Watertown, Inc., and Post Motors, Inc. (collectively, Lexus), were liable for $40,000 in compensatory damages for emotional distress, and, concluding that Lexus acted intentionally or with reckless disregard for Gyulakian's rights under the discrimination laws, also awarded Gyulakian $500,000 in punitive damages.

Lexus filed a motion for judgment notwithstanding the verdict (judgment n.o.v.), or, in the alternative, for a new

---

[3] The jury returned verdicts in favor of the defendants, Lexus of Watertown, Inc., and Post Motors, Inc. (collectively, Lexus), on claims of retaliation and unlawful threat.  Those verdicts are not at issue in this appeal.

trial or a remittitur.  A judge of the Superior Court allowed the defendant's motion for judgment n.o.v. in part, denying the motion with respect to the jury's imposition of compensatory damages but allowing it as to the award of punitive damages.

Gyulakian appealed on the issue of punitive damages, and Lexus cross-appealed the award of compensatory damages.  We allowed Gyulakian's application for direct appellate review and affirm the award of compensatory damages.  We also reverse the trial judge's ruling as to the punitive damages award, because, based on the evidence at trial, the jury could have found that, independent of the conduct of harassment engaged in by its supervisory employee, Lexus failed to take adequate remedial measures after being put on notice of a sexually hostile or offensive work environment, and that that failure was outrageous or egregious.  The jury's award of punitive damages is reinstated, and the matter remanded for consideration of Lexus's motion for remittitur.[4]

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Defense Lawyers Association; the New England Legal Foundation and Associated Industries of Massachusetts; the Massachusetts Employment Lawyers Association, the American Civil Liberties Union of Massachusetts, GLBTQ Legal Advocates & Defenders, the Jewish Alliance for Law and Social Action, and the Lawyers' Committee for Civil Rights and Economic Justice; and the Women's Bar Association of Massachusetts.

1. <u>Factual and procedural background</u>.  The jury could have found the following.[5,6]

a. <u>Gyulakian's employment</u>.  Gyulakian was an employee of Lexus from 2003 through January 4, 2012, when her employment was terminated.  Between June, 2010, and the end of her employment at Lexus, Gyulakian acted as a finance manager, during which time Ferreira was her direct supervisor.  Ferreira, Lexus's finance director, was responsible for assigning hours, vacations, and work flow, and would carry out performance evaluations for all of the finance managers.  Ferreira recommended Gyulakian for the finance manager position, and was included in the decision to fire her.

Despite Gyulakian's success in her role as finance manager, her employment at Lexus was terminated at a meeting on January 4, 2012, because, as Vincent Liuzzi, Lexus's general manager, testified, Gyulakian's relationship with her coworkers had deteriorated.  While in that meeting, Gyulakian reported to Liuzzi and Michael O'Connell, Lexus's general sales manager, that, during her tenure in the finance department, Ferreira sexually harassed her and cultivated a sexually hostile or

---

[5] Some factual details are reserved for later discussion.

[6] Because we are reviewing the grant of a motion for judgment notwithstanding the verdict (judgment n.o.v.), we summarize the evidence in the light most favorable to the plaintiff, Emma Gyulakian, disregarding evidence favorable to Lexus.  See <u>Esler</u> v. <u>Sylvia-Reardon</u>, 473 Mass. 775, 777 (2016).

offensive work environment. Gyulakian also reported the same conduct to human resources manager Tammy Grady-Brown later that day. Prior to the day on which her employment was terminated, Gyulakian had not reported the harassment to Liuzzi or Grady-Brown.[7] She had, however, informed Tony Bruno, an assistant general sales manager and Ferreira's supervisor, on multiple occasions about various sexually offensive incidents over the course of the previous eighteen months. After Gyulakian was terminated, Lexus purportedly conducted an investigation, which uncovered no corroboration of her allegations, and Ferreira was not disciplined.

    b. The sexual harassment policy. At all relevant times, Lexus had a sexual harassment policy in place, and held trainings for employees and supervisors on that policy.[8] The policy read: "Any employee that feels that (s)he is a victim of sexual harassment should immediately report such actions in accordance with the following procedure. All complaints will be promptly and thoroughly investigated." The reporting guidelines

---

[7] Gyulakian testified that, prior to termination of her employment, she had not informed Liuzzi of Ferreira's harassment because she believed that he enjoyed Ferreira's off-color jokes and had even participated in sexually harassing her. For instance, Gyulakian testified that Liuzzi forwarded her an advertisement for a "goat stand" for "milking," which Gyulakian interpreted as a comment about her breasts.

[8] Gyulakian signed the sexual harassment policy to acknowledge that she had read it.

instruct employees to "report the situation to either [Liuzzi] . . . or [Grady-Brown]."  The policy allows that "[i]f an employee prefers not to discuss the matter with these individuals, (s)he may go directly to any other member of management."  There is no definition in the policy regarding who qualifies as "any other member of management."

c. The alleged discrimination.  The jury heard evidence that Ferreira had, since Gyulakian became a finance manager, habitually and graphically sexually harassed her, and that she was working in an otherwise sexually hostile or offensive work environment.  By way of example, Ferreira would often comment on Gyulakian's "nipples," "boobs," and "ass."  Ferreira asked Gyulakian if they would one day sleep together so he could actually see her breasts.  At a sexual harassment training, Ferreira commented to Gyulakian about how harassment sounds like "her ass."  Gyulakian testified that the sexually charged comments would come on an almost daily basis.  The assaults were also physical in nature, as Ferreira once violated Gyulakian's personal "no touching" rule by touching her buttocks, and, on other occasions, Ferreira would attempt to throw coins down Gyulakian's blouse.  At one point, Gyulakian witnessed Ferreira, O'Connell, and Bruno looking at naked photographs of Gyulakian's coworker on the coworker's cellular telephone.  On another occasion, Robert Silvester, the former Lexus office manager,

circulated a memorandum regarding Ferreira's inappropriate behavior after he heard Ferreira discussing anal intercourse in the office.

d. Procedural background. Gyulakian commenced this action against Lexus on January 10, 2013, asserting four claims under G. L. c. 151B, § 4, for harassment based on sex and national origin, on the grounds that she was subjected to a hostile work environment because of her (1) sex and (2) national origin[9]; (3) retaliation and unlawful threats for complaining of that hostile work environment; and (4) termination on an impermissible basis. At the close of Gyulakian's evidence, Lexus unsuccessfully moved for a directed verdict. The motion did not specifically challenge the imposition of punitive damages. Over Lexus's objection, the special verdict slip presented to the jury included a punitive damages question. The jury returned a verdict in favor of Gyulakian on the sexually hostile or offensive work environment claim, awarding Gyulakian $40,000 in compensatory damages and $500,000 in punitive damages. The jury returned verdicts in favor of Lexus on the remaining claims.[10]

Lexus filed a motion for judgment n.o.v. or, in the alternative, for a new trial or a remittitur, requesting, among

---

[9] Gyulakian dropped the hostile work environment claim based on national origin prior to trial.

[10] Gyulakian did not appeal the jury's verdicts on the retaliation and unlawful termination claims.

other things, that the judge set aside or decrease the awards of compensatory and punitive damages. The motion for judgment n.o.v. was allowed as to the award of punitive damages and denied as to the compensatory damages. The judge concluded that an employer "may not be vicariously liable for punitive damages" under G. L. c. 151B based purely on the actions of its supervisory personnel, and that the jury were not provided with sufficient evidence of outrageous or egregious behavior by Lexus.

Gyulakian appealed from the judge's decision to set aside the award of punitive damages, and Lexus cross-appealed, arguing that the evidence did not support a finding of any liability and its motion for judgment n.o.v. should have been allowed as to the award of compensatory damages.

2. Discussion.[11] a. Lexus's cross appeal. Lexus argues that Gyulakian's evidence was insufficient to warrant

---

[11] Our review of the allowance or denial of a motion for judgment n.o.v. pursuant to Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), considers "whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the nonmoving party." Esler, 473 Mass. at 780, quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 55 (2004). See Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 94 n.5 (2009). That "evidence is reviewed in the light most favorable to the plaintiff, 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence,'" Id., quoting Bavuso v. Caterpillar Indus., Inc., 408 Mass. 694, 695 n.1 (1990), and we disregard the evidence favorable to the defendant. See Esler, supra at 777.

compensatory damages because it did not show that her work performance suffered as a result of the harassment or that the harassment altered the conditions of her employment. Lexus also argues that the judge erred in failing to include a question on the special verdict form asking whether the plaintiff's suffering was caused by the harassment. We are not persuaded by either contention.

i. Sufficiency of the evidence. It is unlawful "[f]or an employer, personally or through its agents, to sexually harass any employee." G. L. c. 151B, § 4 (16A). Sexual harassment is defined as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." G. L. c. 151B, § 1 (18), as amended through St. 1987, c. 473, § 2. Chapter 151B, § 4 (1), "applies not only to hiring, firing, and compensation, but also to the 'terms, conditions or privileges of employment.'" College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 162 (1987) (College-

---

"We do not defer to the judge's view of the evidence but examine the case anew, following the same standard the judge is obliged to apply." MacCormack v. Boston Edison Co., 423 Mass. 652, 659 (1996).

Town).  Compensatory damages incurred based on the actions of supervisory personnel who create a sexually hostile or offensive work environment can be imputed to the employer.  See id. at 165-166.

To prevail on a claim of sexual harassment based on the creation of a sexually hostile or offensive work environment, the plaintiff bears the burden of establishing that the conduct alleged was both "subjectively offensive" and "sufficiently severe and pervasive to interfere with a reasonable person's work performance."  Dahms v. Cognex Corp., 455 Mass. 190, 205 (2009), quoting Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411, 412 n.2 (2001).  See College-Town, 400 Mass. at 162.  A sexually hostile or offensive work environment is one that is "pervaded by harassment or abuse," resulting in "intimidation, humiliation, and stigmatization" that poses a "'formidable barrier' to the plaintiff's full participation in the workplace" (citation omitted).  Pelletier v. Somerset, 458 Mass. 504, 523-524 (2010).

Considering the evidence in the light most favorable to the plaintiff, the record is rife with evidence from which the jury could have concluded that the behavior to which Gyulakian was subjected was both objectively and subjectively offensive. Ferreira's unwanted sexual attention came on a daily basis and to such a degree that during her tenure under Ferreira,

Gyulakian was forced to implement a "no-touching" rule in order to keep her supervisor at bay.  From this evidence, the jury could infer that Ferreira's conduct, over a period of eighteen months, "was sufficiently pervasive to alter the conditions of [Gyulakian's] employment, and thus created a sexually harassing working environment."  College-Town, 400 Mass. at 162.  In any event, the evidence was sufficient to support a finding that the discrimination to which she was subjected caused her to suffer emotional distress, interfered with her work performance, and would have interfered with a reasonable person's work performance, thus resulting in a "formidable barrier" to her full participation in the workplace.  See Esler v. Sylvia-Reardon, 473 Mass. 775, 780 (2016), quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 55 (2004); Pelletier, 458 Mass. at 523-524; Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 93 n.3 (2009); Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549, 570-571, cert. denied sub nom. Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination, 543 Mass. 979 (2004).

ii.  Jury instructions.  Lexus asserts that the trial judge committed material error in not including a separate special question on the special verdict form regarding whether Gyulakian

sufficiently proved that her suffering was caused by Ferreira's harassment.[12]

The jury were properly charged as to the law.  The judge instructed the jury that no damages could be awarded for injuries not "conducted by one of the employer[']s supervisors." The special verdict form also asked the following questions: (1) "Do you find that Ms. Gyulakian was subjected to an unlawful hostile work environment?" and (2) "What amount of damages, if any, do you find were caused by the unlawful hostile work environment?"  The jurors checked the box indicating "Yes" as to the first question, and determined that the hostile work environment caused $40,000 worth of damages.  The implication of the trial judge's instruction, supplemented by the questions on the special verdict form, is that Lexus could not be liable for damages but for its supervisor causing the sexually hostile or offensive work environment.  The trial judge did not err in denying the defendant's motion for judgment n.o.v. as to the jury's award of compensatory damages.

b.  <u>Scope of punitive damages</u>.  This case puts at issue the scope of an employer's liability for punitive damages when its employee creates a sexually hostile or offensive work

---

[12] Before the jury were charged, the defendant proposed a special jury question that would have asked whether "sexual harassment of the plaintiff [was] a substantial legal cause of the plaintiff's injury."  The judge denied the proposed question.

environment.[13]  Gyulakian argues that punitive damages are

warranted against Lexus on two grounds:  first, that Lexus

should be punishable based on the actions of its supervisory

_____

[13] The punitive damages jury instruction given by the trial judge was in accord with our decision in Haddad, 455 Mass. at 110-111.  The instruction was distributed to the jury, and read:

"If you find that the defendant has intentionally discriminated against the plaintiff, you may consider whether punitive damages are warranted.  To sustain an award of punitive damages, a finding of intentional discrimination alone is not sufficient.  An award of punitive damages requires a heightened finding beyond mere liability and also beyond a knowing violation of the statute.  Punitive damages are warranted where the conduct is so offensive that it justifies punishment and not merely compensation.  Unlike compensatory damages, which compensate the plaintiff for the harm she has suffered, the purpose of punitive damages is to punish the defendant for conduct that is outrageous or egregious because of the defendant's evil motive or reckless indifference to the rights of others.  Punitive damages are appropriate where the defendant's misconduct is extraordinary and warrants condemnation and deterrence.

"In making an award of punitive damages you should consider:

"(1) The character and nature of the Defendant's conduct;

"(2) The amount of money needed to deter any future acts of discrimination;

"(3) The actual harm suffered by the Plaintiff; and

"(4) The magnitude of any potential harm to other victims if similar future behavior is not deterred.

"If you do award punitive damages, you should fix the amount by using calm discretion and sound reason and make sure that such damages are not overlapping."

personnel, regardless of whether Lexus was aware of that conduct; and, second, that, after being notified of the harassment, Lexus's failure to take sufficient steps to remedy the discrimination should be punishable.

As to Gyulakian's first proposed source of punitive damages, we are not persuaded that a supervisor's creation of a sexually hostile or offensive work environment alone is sufficient to warrant the imposition of punitive damages on the employer. Punitive damages are intended to fulfil a prophylactic purpose, and serve little benefit when imposed on an employer for the actions of a supervisory employee where that supervisor's discriminatory transgressions were unknown to the employer. See Haddad, 455 Mass. at 110-111 (punitive damages only imposed for knowing violations and "outrageous or egregious" conduct); Pine v. Rust, 404 Mass. 411, 415 (1989) ("Punitive damages are not favored in Massachusetts . . ."); Restatement (Second) of Agency § 217C (1958). In determining whether to impose punitive damages against an employer based on its supervisory employee's creation of a sexually hostile or offensive work environment, the scope of our inquiry is independent of the direct actions of that employee, and considers whether the employer's response, once it is on notice of the offensive behavior, was sufficient to address the complained-of harassment.

Whether a plaintiff is entitled to punitive damages from his or her employer on the basis of being exposed to a sexually hostile or offensive work environment created by one of its employees is therefore a two-step inquiry. We consider first whether the employer was on notice of the harassment and failed to take steps to investigate and remedy the situation; and, second, whether that failure was outrageous or egregious. See Haddad, 455 Mass. at 110.[14,15]

i. Waiver. Before we reach the issue whether Lexus is liable for punitive damages, we must consider if Lexus waived the opportunity to challenge the imposition of punitive damages when it did not specifically move for a directed verdict on the issue. The trial judge concluded that the issue was not waived because Lexus raised the propriety of imposing punitive damages

---

[14] While the punitive damages instructions fashioned from Haddad, see note 13, supra, are fundamentally correct, in circumstances where punitive damages are sought against an employer arising out of the sexually offensive behavior of an employee (even one with some supervisory responsibility), the instructions should clarify that it is the actions of the employer, not the actions of that employee, that are the appropriate focus, and that it is the employer's conduct that must be found to be outrageous or egregious, thereby justifying punishment and not mere compensation.

[15] The trial judge and parties label these two sources of potential punitive damages liability as "vicarious" and "direct," respectively. We note that all liability against entities for the creation of sexually hostile or offensive work environments is imputed, or "vicarious."

on an imputed basis under G. L. c. 151B while challenging the availability of such damages on the special verdict form.

Motions for judgment n.o.v. are governed by Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998).  They are allowed "only when a motion for directed verdict has been made at the close of evidence."  Bonofiglio v. Commercial Union Ins. Co., 411 Mass. 31, 34 (1991). A motion for a directed verdict must "state the specific grounds therefor."  Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974).  Because a motion for judgment n.o.v. is "technically a revised motion for a directed verdict, no grounds for the motion for judgment [n.o.v.] may be raised which were not asserted in the directed verdict motion."  Bonofiglio, supra.  This requirement "is an important one," as it "allows the judge knowingly to rule on the question before him [or her], and it allows the opposing party an opportunity to rectify any deficiencies in its case -- or, more precisely, an opportunity to seek leave from the court to do so."  Id. at 34-35.

The trial judge's disposition as to the waiver issue was appropriate.  Lexus's motion for a directed verdict, which challenged the sufficiency of the evidence as to a finding of liability, encompassed the potential for punitive damages, as they were subsumed in the G. L. c. 151B claims, and any chance for the return of punitive damages would have been nullified had the trial judge granted the motion.  See Bain v. Springfield,

424 Mass. 758, 761-762 (1997) (defendant's motion for directed verdict on ground that evidence was insufficient for liability preserved issue, raised for first time on appeal, that punitive damages were excessive). This is particularly the case where Lexus lodged a timely objection regarding punitive damages to the proposed special verdict form, and it therefore successfully preserved the issue for appeal.

ii. Lexus failed to take adequate remedial measures after learning of Ferreira's sexually harassing conduct. Where the employer is aware of a sexually hostile or offensive work environment, the potential for punitive damages against the enterprise is triggered and an inquiry into the response by the employer is warranted. See Trinh v. Gentile Communications, LLC, 71 Mass. App. Ct. 368, 376-377 (2008). The first step in our analysis therefore is to consider whether Lexus was notified of -- and failed to remedy -- the sexually hostile or offensive work environment to which Gyulakian was subjected. Gyulakian maintains that (1) she made complaints to management personnel during her tenure at Lexus, (2) Lexus failed to respond adequately to her complaints, and (3) Lexus's purported investigation was a sham.

A. Lexus was on notice of Ferreira's behavior. There is no bright line rule delineating who must be notified before an employer has been put on notice of harassment in the workplace.

Suffice it to say, if an employee complains to the officials identified in the employer's sexual harassment policy,[16] the employer would be put on sufficient notice to trigger an obligation to investigate and take remedial action if the complaint proves to be well founded.  The failure to do so opens the door to the potential imposition of punitive damages if the jury conclude that the employer's failure was sufficiently outrageous and egregious.  Of course, an employer can become aware of sexually harassing conduct engaged in by its employees by means other than a complaint made in accord with the employer's sexual harassment policy.  Here, the evidence was sufficient to support a jury finding that Lexus was on notice of the sexually harassing conduct of its employee (Ferreira), well before Gyulakian was terminated.

Testimony at trial tended to show that members of senior management were aware of the sexually hostile or offensive work environment at the organization.  By way of example, O'Connell (the Lexus general sales manager) witnessed Ferreira attempt to throw coins down Gyulakian's blouse; Gyulakian testified that she complained on several occasions to Bruno (the assistant

---

[16] General Laws c. 151B, § 3A, requires that employers establish a sexual harassment policy, including a list of "persons to whom complaints should be made."

general sales manager) concerning Ferreira's conduct;[17] and Silvester, the former Lexus office manager, heard Ferreira discussing anal sex in the office.[18]  Lexus was again put on notice of the harassment on the day Gyulakian's employment was terminated when she directly informed Liuzzi, O'Connell, and Grady-Brown of Ferreira's conduct.

B.  Lexus failed to adequately remedy the discrimination. Because Lexus had been notified in at least two ways of the sexual harassment in its workplace, we consider its remedial efforts after those notifications.  First and foremost, where a conduit for sexual harassment notifications, as delineated in the employer's sexual harassment policy, fails to appropriately report or in any way investigate a sexual harassment complaint,

---

[17] While there appears to be conflicting testimony regarding whether the sexual harassment policy requires direct reporting to the general manager or HR manager, the plain language of the policy, corroborated by the HR manager at the time, Grady-Brown, confirmed that it was acceptable to report harassment to any member of management.  The jury could have concluded that Bruno, the assistant general sales manager and Ferreira's direct supervisor, was an appropriate conduit for such complaints. Whether notice by means of a complaint communicated in accord with the employer's sexual harassment policy is necessary when the alleged harasser is a member of senior management at the company, and in such capacity may virtually stand in its shoes, is not a question we need reach in this case.

[18] After hearing this conversation, Silvester told Ferreira that he believed that such conduct was inappropriate, drafted a memorandum to that effect, and circulated it to his direct supervisor, Joe Tieuli, the office comptroller.  When O'Connell and Liuzzi read Silvester's memorandum, they laughed and ignored it.  Ferreira was never punished.

that lack of response is per se evidence of a failure to adequately remedy the purported discrimination.  Here, because there was evidence presented that Bruno failed to make any remedial efforts after hearing reports that his supervisee was creating a sexually hostile or offensive work environment, the jury were entitled to conclude that Lexus did not adhere to its own sexual harassment policy and failed to take any action to remedy the discrimination.[19]

Second, the failure to remedy alleged discrimination also can arise where the employer purports to investigate the discrimination, but does so in an inadequate manner.  Here, once Liuzzi and Grady-Brown sought to look into Gyulakian's complaint, the jury could have found their investigation to be wholly insufficient.  Liuzzi testified that, on learning of Ferreira's sexual harassment during the meeting at which Gyulakian reported Ferreira's conduct to him, he "honestly didn't believe [Gyulakian]."  Liuzzi told Gyulakian that there might be a job opportunity at Toyota of Watertown (Toyota), a sister company to Lexus, but then warned her that reporting the sexual harassment to Grady-Brown (which she ultimately did) might jeopardize that opportunity.  Despite his reservations, given his role in the company, Liuzzi was responsible for

---

[19] Bruno denied receiving such complaints.  The jury, having observed the witnesses, were entitled to credit Gyulakian's testimony.

conducting an adequate and impartial investigation into Gyulakian's claims.

With respect to that investigation, Liuzzi testified that he interviewed Ferreira, O'Connell, Bruno, and Joe Tieuli, the Lexus comptroller. Liuzzi did not interview anyone besides Ferreira in the finance department because he did not want to undermine Ferreira. Liuzzi further testified that after Tieuli, who had worked with Ferreira for twenty years, told him that there had never been another allegation against Ferreira, Liuzzi concluded his investigation. When Tieuli testified during the trial, however, he denied that he had been questioned with regard to Gyulakian's allegations.[20] Grady-Brown also testified during trial that she conducted her own investigation into Gyulakian's complaints, but the jury saw no notes from any of her or Liuzzi's investigative interviews.

Three cases, Haddad, 455 Mass. at 106-109; College-Town, 400 Mass. at 167-168; and Trinh, 71 Mass. App. Ct. at 377-378, inform our inquiry into whether the investigation was adequate. In Haddad, supra at 108, a case regarding gender discrimination, we concluded that the defendant-employer's purported investigation was a "sham," in that no male employees were

---

[20] A response to Gyulakian's pretrial interrogatory asking for a description of Lexus's investigation of Gyulakian's sexual harassment report was read to the jury, and it included that during his investigation, Liuzzi only interviewed Ferreira, Bruno, O'Connell, and Silvester.

investigated or disciplined for infractions similar to those for which the plaintiff's employment was terminated. We likewise concluded that the defendant-employer in College-Town, supra, was liable for a failure to investigate because "[the plaintiff] was never informed about the staff meeting [at which the investigation took place], while [the alleged harasser] was present throughout. The staff were never questioned individually. [The plaintiff] was never provided an opportunity to confront [the alleged harasser], nor was she interviewed after [the alleged harasser] and the staff had been approached." Finally, in contrast, the Appeals Court reasoned in Trinh, supra at 377-378, that punitive damages were not appropriate because the defendant-employer's investigators interviewed all the relevant personnel, took interview notes that reflected the questions asked of their interview subjects, and gave the plaintiff an opportunity to participate in the investigation.

In sum, based on our review of the trial record, we are persuaded that there was sufficient evidence on which the jury could find that members of Lexus management failed to conduct an adequate investigation after being made aware of Ferreira's reported harassment. There were several apparent discrepancies and shortcomings in the alleged investigation: no members of the finance department, who would have been most likely to witness the alleged conduct, were interviewed, purportedly

because Liuzzi did not want to undermine Ferreira, see College-Town, 400 Mass. at 167-168; Gyulakian was never contacted during the course of the investigation, see id.; and the investigation was marred from the beginning, as it was carried out by a member of management who admitted to carrying a bias against the plaintiff. See Haddad, 455 Mass. at 106-109. It is particularly concerning that the purported investigation uncovered no corroboration of Gyulakian's allegations regarding the sexualized workplace even though a former office manager had previously circulated a memorandum regarding Ferreira's inappropriate behavior. It is also noteworthy that many of Gyulakian's allegations were corroborated at trial by members of the Lexus staff, none of whom was contacted as part of Lexus's internal investigation.[21] See College-Town, supra.

---

[21] Taylor Benson, a former title clerk at Lexus, testified that Ferreira made a comment regarding anal sex (which she reported to Silvester), that she witnessed Ferreira threatening to violate Gyulakian's "no touching" rule on several occasions, and that Ferreira personally made an inappropriate comment to her regarding her shirt. Ferreira told Benson that Gyulakian wore "stripper shoes." Benson was not interviewed as part of the investigation. Scott Polivy, a former salesperson at Lexus, confirmed that Ferreira had commented on Gyulakian's breasts at the office. Polivy was not interviewed as part of the investigation. Adam Skolnick, the former general sales manager who supervised Ferreira, heard him making comments about female coworkers' breasts and buttocks that would not have been acceptable at "church or temple." Skolnick was not interviewed as part of the investigation. Michael Berube, a former sales consultant, testified regarding Ferreira's daily "vulgar profanity" relating to women, including their female coworkers.

In any event, given that the breadth of Lexus's investigation was a disputed issue at trial, the jury could have found that any such investigation was abbreviated and colored by Liuzzi's belief that Gyulakian's claims were false.  See Esler, 473 Mass. at 780, quoting Phelan, 443 Mass. at 55; Haddad, supra at 94 n.5.

iii.  Lexus's failure to take adequate remedial measures after being notified of Ferreira's conduct warranted the imposition of punitive damages.  Where the employer's failure to remedy the discriminatory conduct is "outrageous or egregious," Haddad, 455 Mass. at 110, punitive damages may be imposed.[22]  In Haddad, we fashioned a list of factors appropriate in determining whether punitive damages are appropriate.  Id. at 111.  We look to (1) "whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class)"; (2) "whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or

---

[22] Our punitive damages analysis requires a "knowing violation of the statute."  Haddad, 455 Mass. at 110.  Where employers are required by statute to adopt a policy against sexual harassment, G. L. c. 151B, § 3A, we are satisfied that an employer that is aware of workplace harassment and fails to remedy that harassment has committed a "knowing violation of the statute."  Haddad, supra at 108, 110 (evidence that employer has policy prohibiting harassment sufficient for showing that it was aware that gender discrimination was not legally permitted).  Our analysis is therefore limited to whether that failure was "outrageous or egregious."  Id. at 110.

recklessly disregarded the likelihood that serious harm would arise"; (3) "the actual harm to the plaintiff"; (4) "the defendant's conduct after learning that the initial conduct would likely cause harm"; and (5) "the duration of the wrongful conduct and any concealment of that conduct by the defendant." Id.

In considering whether Lexus's failure to remedy the discrimination warrants the imposition of punitive damages, we again examine its conduct at both of the junctures at which we determined it was on notice of Ferreira's conduct. The analysis therefore takes into account the fact that Lexus both failed to comply with its own sexual harassment policy and also failed to make an adequate inquiry once an investigation began.

Lexus was aware, through Bruno, that Gyulakian had made multiple complaints regarding Ferreira. It was also aware, as evidenced by its sexual harassment policy, that sexual harassment in the workplace is unlawful. Therefore, when Bruno failed to proceed with any investigation, as was required by the sexual harassment policy, this failure was made with Lexus's knowledge that such conduct would cause continued discriminatory harm. Haddad, 455 Mass. at 111 (second factor). The fourth and fifth Haddad factors, both concerning the defendant's conduct after learning of the discrimination, also strongly weigh in

favor of Gyulakian, given that the jury were entitled to find that Lexus's investigation was woefully insufficient.  See id.

Based on the foregoing, we conclude that the jury were warranted in finding that, independent of Ferreira's harassing conduct, Lexus acted intentionally or with reckless disregard for Gyulakian's rights under the discrimination laws, and that its actions were outrageous or egregious.  See id.  The trial judge's allowance of Lexus's motion for judgment n.o.v. as to the award of punitive damages is therefore reversed, and the jury award is reinstated.  However, because the trial judge did not consider Lexus's motion for remittitur as to those punitive damages, instead opting to vacate them entirely, the case is remanded for consideration of that issue.[23]

c.  Attorney's fees.  The trial judge allowed Gyulakian's motion for attorney's fees but, after also granting Lexus's motion for judgment n.o.v. as to the punitive damages award, concluded that "[t]he vacated award of punitive damages represented a significant portion of the plaintiff's award."  She therefore reduced the award of attorney's fees by twenty-five per cent.  Having reinstated the punitive damages award, we also conclude that the judge's reduction in the plaintiff's

---

[23] The motion for remittitur is only remanded to consider the award of punitive damages, not compensatory damages.

attorney's fees is inappropriate, and remand the case to the Superior Court for a calculation of the amount to be paid.[24]

3. Conclusion. The judge's order granting judgment n.o.v. as to the punitive damages award is reversed, the jury's verdict is reinstated, and the case is remanded for calculation of Gyulakian's attorney's fees and consideration of Lexus's motion for remittitur as to the award of punitive damages.[25] In all other respects, judgment for the plaintiff is affirmed.

So ordered.

---

[24] A prevailing party on a G. L. c. 151B claim is entitled, "irrespective of the amount in controversy," to reasonable attorney's fees and costs, "unless special circumstances would render such an award unjust." G. L. c. 151B, § 9. The amount of attorney's fees "is largely discretionary with the judge, who is in the best position to determine . . . the fair value of the attorney's services." Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993).

[25] Gyulakian asserts that postjudgment interest should be calculated from the date of the verdict (December 19, 2014) rather than from the date judgment was entered (March 31, 2015). See Mass. R. Civ. P. 58 (a), as amended, 371 Mass 908 (1977) ("clerk . . . shall forthwith prepare, sign and enter judgment without awaiting any direction by the court"; "[e]ntry of the judgment shall not be delayed for the taxing of costs"); Fontaine, 415 Mass. at 328 ("plaintiff is entitled to postjudgment interest on the liquidated damages award . . . from . . . the date of the jury's verdict"). "The court, however, retains power to order otherwise where, for example, the court has before it a motion for judgment n.o.v. (Rule 50 [b]) and directs that the clerk not enter judgment . . . immediately." 1973 Reporters' Notes to Rule 58, Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 1108 (LexisNexis 2015). Here, the judge did not rule on the defendant's motion for judgment n.o.v. until March 24, 2015, and judgment on the jury's verdict was not entered until March 31, 2015. We leave the disposition of the interest matter to the trial court, to be determined as part of the defendant's motion for remittitur.