# United States Court of Appeals
## For the First Circuit

Nos. 23-1697, 23-1703

ERIC MOORE,

Appellee, Cross-Appellant,

v.

INDUSTRIAL DEMOLITION LLC,

Appellant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Gelpí, Thompson, and Kayatta,
Circuit Judges.

Jamie Goodwin, with whom Samuel Kennedy-Smith and Michael Turiello were on brief, for appellee, cross-appellant.

Thomas M. Metzger, with whom Alexa M. Esposito was on brief, for appellant, cross-appellee.

May 13, 2025

**THOMPSON, Circuit Judge.** In December 2019, Eric Moore ("Moore"), an employee of Industrial Demolition, LLC ("Industrial Demolition" or "Industrial"), injured his hip during his employ on the demolition site of the Brayton Point Power Station in Somerset, Massachusetts.[1] Despite the limitations resulting from his injury, Moore remained capable of performing his job on the demolition site with reasonable accommodation by Industrial. So, a few days after he got hurt, Moore returned to Brayton Point with a doctor's note outlining his constraints relative to his injury and requested an accommodation from the company as to allow him to continue working. With Industrial's permission, Moore then began working with certain restrictions on his activities designed to accommodate his injury. Nevertheless, the constraints outlined in Moore's doctor's note sparked the ire of his direct supervisor in short order, and Moore's employment with Industrial Demolition ended soon thereafter when he was directed to "[h]it the gate" following an argument over his job-related limitations and his reiterated requests for accommodation considering them. It is that directive which spawned the series of proceedings leading us here today.

---

[1] The Brayton Point Power Station was Massachusetts' last utility-scale, coal-fired electricity generating plant. See U.S. Energy Info. Admin., *Massachusetts State Energy Profile*, EIA.GOV., https://perma.cc/D9UA-3C2E.

Ultimately, after some travel, a federal jury in the District Court for the District of Massachusetts found that Industrial Demolition failed to accommodate Moore's injury and that it retaliated against him for requesting or using a reasonable accommodation. The jury awarded Moore damages in the amount of $10,035. Neither Moore nor Industrial Demolition was pleased with this result, and both parties now move this court to reverse or amend the judgment or to grant a new trial. We will outline and address the parties' arguments as we go, but here's the spoiler alert: The parties' requests for relief are denied.

**HOW WE GOT HERE**

Our recitation of the factual background is done in the light most complimentary to the jury's verdict. See Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d 189, 198 (1st Cir. 2007).

**I.    The Main Characters**

Industrial Demolition is a national commercial demolition company headquartered in St. Louis, Missouri, that razes industrial sites and redevelops the land for sale. Its Chief Executive Officer ("CEO") is Michael Roberts ("Roberts"), and its Chief Operating Officer ("COO") is Rebecca Lydon ("Lydon"). Roger Oberkramer ("Oberkramer") is a former site supervisor for Industrial Demolition, and Moore is one of its former employees. The Brayton Point Power Station ("Brayton Point"), the

once-largest coal-fired generating plant in New England, is now in the dustbin of history.

## II.  The Backdrop

Moore's work association with Industrial Demolition came about like this.  Before his employment with Industrial at the Brayton Point site, Moore was a missionary in El Quinche, Ecuador.  But then his wife became ill with Monge's disease, forcing Moore and his young family to return to the United States in 2018.[2]  They wound up settling in Aurora, Indiana, where Moore began working for Industrial Demolition as a driver and laborer on the nearby demolition site of the Tanner's Creek Generating Station.[3]  In this role, Moore worked using both his hands and mechanical equipment to move scrap and reclaim copper, aluminum, electrical wires, and

_____

[2] Monge's disease, also known as chronic mountain sickness, is a progressive incapacitating syndrome affecting people living in high-altitude regions.  See Francisco C. Villafuerte & Noemí Corante, _Chronic Mountain Sickness: Clinical Aspects, Etiology, Management, and Treatment_, 17 High Altitude Med. Biol. 61 (2016).

[3] The Tanner's Creek Generating Station was a utility-scale, coal-fired electricity generating plant located on the north bank of the Ohio River in Lawrenceburg, Indiana.  The plant ceased operations in 2015 after litigation involving the Environmental Protection Agency and eight states concerning harmful emissions that traveled from Tanner's Creek and other nearby plants to the East Coast.  See Juliet Eilperin & Steven Mufson, _American Electric Power agrees to close 3 coal plants in emissions settlement_, Wash. Post (Feb. 25, 2013), https://perma.cc/TL9B-AFE5.

steel.  He was supervised by Oberkramer and compensated at a rate of $30 per hour.

After Oberkramer and Moore worked together at Tanner's Creek, Oberkramer invited Moore and his family to move to Massachusetts to work on the Brayton Point demolition project. Moore initially declined, believing that Industrial Demolition's "work environment was so very dangerous" and that "[Oberkramer] had absolutely no management ability," as he frequently belittled employees and disregarded their well-being.[4]  As Moore explained at trial, he "just really didn't want to put up with [Oberkramer]." But, by May or June 2019, with his fifth child on the way, and being the "sole breadwinner" for his family, Moore decided to take Oberkramer up on the job offer.  Moore and his family relocated to Westport, Massachusetts, and he began working at Brayton Point, again, primarily as a driver and laborer.

### III. Trouble on Brayton Point

Notwithstanding the inherent risks to workers associated with commercial demolition, Industrial had a laissez-fare attitude towards its health and safety practices at the time Moore commenced work at Brayton Point.  In fact, the company only started to take its health and safety procedures seriously after the Occupational

---

[4] Moore testified that, under Oberkramer's supervision, the Tanner's Creek demolition site had no "standard operating procedure" or safety training, and explained that if "somebody got hurt, they'd just tell Roger."

Safety and Health Administration ("OSHA") initiated an investigation into its practices at the site around November of 2019.[5] At that point, Industrial belatedly designated a safety director to design and implement health and safety protocols. Yet Oberkramer continued to oversee labor; and he leaned on the use of threats, racial slurs, misogynistic language, and dangerous instructions to manage his crew. For example, Oberkramer regularly used the n-word and similar vulgar and derogatory epithets in reference to Industrial's on-site employees.[6]

The OSHA investigation caused Industrial Demolition to convert multiple trailers on the site into "clean rooms,"[7] and relative to this conversion endeavor, Moore was assigned to "tear[] down" and "clean out" the trailers. On Saturday, December 7, 2019,

---

[5] Heather Minton ("Minton") was hired by Industrial Demolition as the site's health and safety director prior to the initiation of the OSHA investigation, but she testified that her initial employment duties had "nothing to do with" setting up a safety program. Minton also testified that she took over the safety program only after OSHA initiated its investigation, that Oberkramer was running safety prior to that point, and that the conditions were so poor that "guys were dropping dirty for lead in their blood."

[6] Oberkramer referred to one colleague responsible for ensuring harmful runoff did not contaminate the Mount Hope Bay as "Ms. Piggy."

[7] The clean rooms were designed for employees to "shower [and] put on clean clothes" before leaving the site.

Moore, while executing that assignment, likely injured his hip.[8] Though he was able to finish the workday, over the weekend Moore experienced progressively increasing pain. Come Monday morning, the pain was urgent, and Moore called Oberkramer to tell him he was going to the emergency room. Oberkramer replied "[j]ust let me know."

Moore's physician initially prescribed medication and recommended that he take the week off. But Moore explained he would like to return to work as soon as possible because "he needed the money" since Industrial did not provide paid sick leave. As Moore put it, "if you don't clock in, you don't get paid." The physician then wrote Moore a note that allowed him to return to work immediately but with certain restrictions on heavy lifting and prolonged standing.[9] The hospital faxed that note to Industrial Demolition, and Moore returned to work the next day on Tuesday, December 10. Upon his return, COO Lydon acknowledged receipt of the doctor's note and stated that "whatever the doctor

---

[8] At trial, Moore told the jury that he did not let anyone know immediately after he was injured. He stated that he remained silent that day because "[his injury] wasn't an issue at the time" and because there was no one to report the injury to other than Oberkramer. Industrial, for its part, argued before the jury that Moore did not report his injury immediately after it occurred because, in fact, Moore was not injured on the job site, but rather elsewhere at some other point in time.

[9] The physician's note indicated that the outlined restrictions were to remain in place "[u]ntil cleared by [Moore's] primary care doctor and/or sports medicine/physiatry."

put[] on the note, that's what the restrictions need to be." With that directive in place, Oberkramer thus "[r]eluctantly" assigned Moore modified duties.[10]

By Friday the 13th, Oberkramer's patience had run thin. Frustrated with Moore's work restrictions, Oberkramer ordered Moore and his team to "get out of [their] machine[s]" and "[w]ork with [their] hands." Moore responded by reminding Oberkramer about the accommodation he had been granted by "the office" for his hip injury and emphasizing that he was "not supposed to be bending over and picking up these pieces of heavy metal." Oberkramer retorted, "I don't give an F about your doctor's note, I don't give an F what the office says. . . . Get the job done. We need production. Start working with your hands." Moore did as he was told, despite the pain he felt in his hip, because he "didn't want to irritate [Oberkramer] any further."

Oberkramer's temper flared again that Friday evening when Moore turned on a vehicle's headlights while parking in a dark area on site. As Moore was clocking out, Oberkramer accused him of "jerking around all week in a machine" and "not getting[] production done"; and he suggested that Moore take some time off. Moore explained that he could not afford to take time off because

---

[10] The accommodations for Moore's injury were designed to last for at least the duration of his workweek, which would have concluded on Saturday, December 14, 2019.

he had a family to support. Oberkramer recommended that Moore return in the new year. Moore responded that he did not "see the problem" and again reminded Oberkramer that he was "following [his] work restriction." Oberkramer reiterated that he did not "give an F about [the work restriction] or what the office has to say." The argument escalated from there, until Oberkramer, "in [Moore's] face yell[ed]," "[y]ou know what? I don't have a need of you here anymore," and he concluded with a directive to Moore to "[h]it the gate and don't come back." Given Moore's past experiences with Oberkramer, he knew that such an outburst meant he was fired.[11]

The following week, Moore called CEO Roberts to discuss what had transpired between him and Oberkramer. Moore told Roberts that Oberkramer had fired him, and he implored Roberts to investigate "what's taking place on the job site." After speaking with Oberkramer and consulting with COO Lydon, Roberts got back to Moore the next day. In that phone call, Roberts conveyed Oberkramer's side of the story, stating that according to Oberkramer, Moore was "fired" for speaking about his wages -- an accusation Moore immediately and vehemently denied. Roberts then acknowledged that "[Oberkramer] [was] a little rough around the

---

[11] Moore testified that Oberkramer had previously instructed employees to "[h]it the gate and [not] come back," and said it was Oberkramer's version of "[y]ou're fired[!]" -- "because employees wouldn't come back after that." As a result of Oberkramer's outburst, Moore was canned one day before his workweek was to conclude.

edges," but seemingly vouched for Oberkramer's methodology by saying he "g[o]t[] the job done and . . . g[o]t[] production." He then told Moore that he was "welcome to stay" with the company and instructed him to "just go and work it out with [Oberkramer]."

## IV.   The Procedural History

Moore and Oberkramer did not work it out. Considering Oberkramer's demonstrated hostile tendencies, Moore concluded that Roberts' directive to seek such resolution was unreasonable, and he did not return to the job site. Instead, Moore's first course of action was to file a complaint against Industrial Demolition with the National Labor Relations Board ("NLRB") alleging that he was unlawfully terminated. An investigation followed, and a settlement between Moore and Industrial Demolition was ultimately reached in October of 2020. That settlement required Industrial Demolition to pay Moore $85,555: $60,639 for back pay, $23,750 for front pay, and $1,166 to account for compound interest.[12]

Moore also filed suit against Industrial Demolition in the Commonwealth's Superior Court. That case was removed to the federal district court on diversity jurisdiction grounds, and, in due course, a four-day jury trial ensued. The jury returned a

---

[12] The appellate record does not contain the specifics of Moore's NLRB complaint, but the settlement agreement marked during the trial makes reference to Industrial's legal obligation to advise its employees of their right to discuss in the workplace wages and compensation with fellow employees.

- 10 -

verdict in favor of Moore, finding under Massachusetts law that Moore had a handicap which Industrial failed to accommodate and that the company retaliated against him by terminating him for requesting or using a reasonable accommodation. The jury calculated and awarded damages in the amount of $10,035, which represented $95,590 in back pay less the $85,555 NLRB settlement.

Unhappy with the trial results, Moore filed a motion to amend the judgment and a motion for a new trial. See Fed. R. Civ. P. 59(e); Fed. R. Civ. P. 59(a). In his motions, he argued a couple of things: that the value of the NLRB settlement should not have been admitted into evidence or considered when calculating the damages award, and that the jury was unlawfully prohibited from considering punitive damages. An equally unhappy Industrial Demolition waged a three-pronged post-verdict attack: It filed a renewed motion for judgment as a matter of law or, in the alternative, a new trial or, in the alternative, a remittitur. See Fed. R. Civ. P. 50(b). Its motion argued that Moore did not have a handicap, so an accommodation was not needed, and that as a matter of law Moore did not suffer retaliation. Industrial also accused the court of engaging in improper conduct during the jury deliberation process. And lastly, the company claimed Moore could not recover damages for the complained-of injuries because he did not meet his legal duty to mitigate damages. The district court

denied both parties' motions, and they are now here seeking this court's relief.

**DISCUSSION**

Each party offers a bouquet of arguments echoing the reasoning from their respective post-trial motions. We will address Industrial Demolition's arguments before moving on to Moore's.

**INDUSTRIAL DEMOLITION'S ARGUMENTS**

**I.    Verdicts: The Rule 50(b) Arguments for Reversal**

A.    The Handicap Finding

In his claim against Industrial, Moore alleged that he had a handicap which the company failed to accommodate in violation of Massachusetts General Laws Chapter 151B ("M.G.L. c. 151B"). Before us, Industrial asserts that Moore, as a matter of law and fact, did not have a handicap requiring an accommodation. The company says that the district court's denial of its Rule 50(b) motion seeking judgment as a matter of law of Moore's failure to accommodate claim was therefore a mistake which merits reversal. To support its legal proposition that the jury's handicap finding was error, the company relies centrally on a theory that Moore's temporary hip injury categorically fell outside of M.G.L. c. 151B's definition of "handicap," considering its short

duration,[13] coupled with its trifling severity,[14] as Industrial would have us see it. Moore counters, saying the district court called the handicap question just right. For the benefit of the reader, we will outline the relevant law and the parties' arguments

---

[13] At trial, Moore acknowledged that during his visit to the emergency room, his physician initially suggested that he "take a week off," and informed him that he could thereafter "come back to work . . . [and] perform [his] full duties with zero restrictions." Moore also testified that he did not experience any physical or mental impairment that prevented him from working following his "active employment at Industrial." Based mainly on that testimony, Industrial asserts that Moore's injury "lasted [only] one week." On the other hand, however, the medical records introduced into evidence indicated that Moore's physicians, when tendering a diagnosis and prognosis, did not conclusively state that his injury would resolve within such a short time.

[14] The medical records introduced into evidence indicated that Moore's reason for visiting the emergency room was "severe [right] hip pain." Moore also testified that his hip injury rendered him "sw[o]ll[en]," "inflam[ed]," "hobbled," "with a limp," unable to "bear weight on [his] leg," and incapable of "even . . . stand[ing] up straight." Moore explained to the jury that he experienced "excruciating" and "progressively increasing" pain following his injury, and that doctors had discovered a "real deep tissue tear in the muscle in [his] hip," for which he was administered Toradol and provided a prescription for oral Motrin. He said he had to "crawl to the bathroom" on the morning he visited the hospital. And he told the jury that at the time of the Friday evening altercation with Oberkramer, he still "wasn't fully recovered." Be that as it may, Industrial says Moore's impairment, considering its short duration, required something more, citing, inter alia, the Massachusetts Commission Against Discrimination Guidelines, § II.A.6, wherein the Commission indicates that "isolated medical problems . . . of short duration usually are not handicaps" under the Commonwealth's law. See also Mass. Bay Transp. Auth. v. Mass. Comm'n Against Discrimination, 879 N.E.2d 36, 48 n.17 (Mass. 2008) (explaining that "[t]he guidelines represent the [Commission's] interpretation of [Chapter] 151B, and are entitled to substantial deference, even though they do not carry the force of law" (citation and internal quotation marks omitted)).

bearing on the jury's finding that Moore "had a handicap" before we explain why this court does not need to determine whether the finding was reasonable to resolve this appeal.

First, as ever, the standard of review. When, as here, statutory interpretation is at play, the denial of a Rule 50(b) motion for judgment as a matter of law invites de novo review. N. H. Lottery Comm'n v. Rosen, 986 F.3d 38, 54 (1st Cir. 2021). And when, as now, a federal court sits in diversity, it is a bedrock principle of federalism that the court is constrained to apply state substantive law. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Hanna v. Plumer, 380 U.S. 460, 465 (1965) ("The broad command of Erie was . . . [that] federal courts are to apply state substantive law and federal procedural law."). The statute relevant to our analysis in this case, M.G.L. c. 151B, provides in part in § 4(16) that it shall be an unlawful practice:

> For any employer, personally or through an agent, to . . . discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made . . . would impose an undue hardship to the employer's business.

The parties do not dispute that M.G.L. c. 151B provides the definition of handicap relevant to Moore's claims, but they do dispute with vigor whether, and to what extent, the Commonwealth's

- 14 -

statute parallels federal law on the definition's score.  Moore, for his share, asserts that the word "handicap" in M.G.L. c. 151B has been interpreted by the Commonwealth's courts in a broad manner akin to the word "disability" in the analogous Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), capturing injuries like his own within the definition's orbit.  See ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (expressly providing, inter alia, protections for certain temporary impairments); see also 29 C.F.R. § 1630.2(j)(1)(ix), App. at 387 (2024) (an Equal Employment Opportunity Commission regulation indicating that a cognizable impairment under the amended ADA may last fewer than six months if it is "sufficiently severe").  Industrial ripostes, asserting that Massachusetts courts have interpreted the word handicap distinctly from the word disability in the federal law, adopting a narrowly circumscribed vision which definitively excludes temporary impairments like Moore's.

Indisputably, Massachusetts courts have recognized that M.G.L. c. 151B and the ADA have notable similarities.  See, e.g., City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 588 n.26 (Mass. 2003) (describing the ADA and M.G.L. c. 151B as "cognate" statutes).  For example, the definition of the term handicap in M.G.L. c. 151B is virtually identical to the

- 15 -

definition of the term disability in the ADA.[15]  Both laws provide three related but independent avenues for defining handicap or disability that fall within the respective terms' boundaries: (1) a physical or mental impairment which substantially limits one or more major life activities of a person; (2) a record of having such impairment; or (3) being regarded as having such impairment. M.G.L. c. 151B, § 1(17); see also 42 U.S.C. § 12102.

Considering the similarities between the statutes, the Supreme Judicial Court of Massachusetts ("SJC") has indicated that Massachusetts courts look to federal law to interpret the definition of handicap under M.G.L. c. 151B, except in those rare instances where the SJC "discern[s] some reason to depart from those [federal] rulings."  City of New Bedford, 799 N.E.2d at 588 n.26; see Flagg, 992 N.E.2d at 364 (looking to federal jurisprudence to resolve an associational discrimination claim);

_____

[15] The minor textual differences between the two statutes, such as the use of the word handicap in the Commonwealth's law versus disability in the ADA, do not alter the meaning between the two.  Dahill v. Police Dep't of Boston, 748 N.E.2d 956, 959 n.7 (Mass. 2001).  Another federal law addressing similar conduct, the Rehabilitation Act of 1973 ("the Rehabilitation Act"), also uses the term "handicap," and defines the term in the same way as M.G.L. c. 151B and the ADA.  See Pub. L. No. 93-516, § 111(a), 88 Stat. 1617, 1619 (1974).  Although Massachusetts courts have sometimes looked to the Rehabilitation Act to resolve claims related to handicap discrimination, neither party in this appeal made any arguments related to that Act.  See, e.g., Flagg v. AliMed, Inc., 992 N.E.2d 354, 364 (Mass. 2013) (reasoning that because the Rehabilitation Act was enacted before M.G.L. c. 151B, unlike the ADA, "[t]he Rehabilitation Act . . . is a more direct analogy to § 4(16)").

<u>Dartt</u> v. <u>Browning-Ferris Indus., Inc.</u>, 691 N.E.2d 526, 532 (Mass. 1998) ("We are also guided in our resolution by interpretations of the Americans with Disabilities Act . . . even though that statute was enacted in 1991, after the enactment of G.L. c. 151B, § 4(16)."); <u>cf.</u> <u>Dahill</u>, 748 N.E.2d at 963-64 (looking to federal case law but holding "it [was] not appropriate to follow the Federal jurisprudence in th[at] case").

Industrial asseverates that this case presents those rare circumstances where Massachusetts law counsels departure from the federal jurisprudence in such a way which removes Moore's injury from the Massachusetts antidiscrimination law's reach. The company points out that, unlike the ADA, M.G.L. c. 151B has not been amended to clarify the inclusion of certain temporary impairments -- and it asserts that Massachusetts plaintiffs therefore face a more demanding standard, identifiable in Massachusetts law and the pre-amendment federal cases, when proving a handicap; a standard which Moore, they argue, failed to meet. <u>See</u> <u>Sutherland</u> v. <u>Peterson's Oil Serv., Inc.</u>, 126 F.4th 728, 738-39 (1st Cir. 2025) (discussing the ADAAA's effect on the standard for proving a disability under federal law). Moore, for his argument, says that Massachusetts courts have interpreted M.G.L. c. 151B in alignment with the ADAAA to support a liberal understanding of the term handicap covering impairments such as his own, citing <u>Massasoit Indus. Corp.</u> v. <u>Mass. Comm'n Against</u>

Discrimination, 73 N.E.3d 333, 339 n.6 (Mass. App. Ct. 2017) (explaining that "the Supreme Judicial Court has rejected the argument that temporary disabilities are unprotected as a matter of law" and noting as additional support that the ADA has since been amended to clarify their inclusion). Moore further asserts that, even before the amendments to the ADA broadening its protections, Massachusetts law already recognized impairments such as his, citing Dartt, 691 N.E.2d at 536 ("[Petitioner] urges us to hold that a temporary disability does not constitute a handicap within the meaning of the statute. We decline to do so.").

Some argument and law scrivened down, we move on to explain why we need not elect a victor on this cragged front to decide Industrial's appeal. That is so because, whether Moore "had a handicap" sufficient to support his failure to accommodate claim, his retaliation claim stood with independent sufficiency to support the jury's damages verdict -- for reasons we will explain in further detail in the next section of this opinion. See, e.g., Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 529-30 (Mass. 2011) ("A claim of retaliation may succeed even if the underlying claim of discrimination fails."). Before excavating the details, we point out for now that both Moore's failure to accommodate and his retaliation claim sought the same back pay based on the same set of operative facts; and the jury did not distinguish the damages between the two claims when rendering its verdict. This court has

previously explained that when there is a general damages award and there are two counts potentially supporting that award, an error in one claim submitted to the jury is deemed harmless where the reviewing court can be "reasonably certain that the jury's verdict did not rest on [the] erroneous basis." See Davis v. Rennie, 264 F.3d 86, 106 (1st Cir. 2001).[16] In other words, as the stated principle pertains to this case, our court does not need to decide whether Moore's injury qualified as a handicap under Industrial's preferred reading of M.G.L. c. 151B, nor do we need to decide whether the injury would qualify if the Commonwealth's law parallels the ADA in the way Moore believes it does, so long as we possess reasonable certainty that the jury's retaliation verdict stood on its own solid ground to support the jury's damages award. See Davis, 264 F.3d at 106. In view of that standard, on the record before us, we find such certainty well within our grasp. The jury, in delivering its verdict that Moore was retaliatorily discharged "for requesting or using a reasonable accommodation,"

---

[16] We note that the court in Davis left open the possibility that, under certain circumstances, a more lenient "substantial evidence" standard might govern this court's review of an individual claim's sufficiency to support a verdict that encompasses several claims of liability, such as when there is no objection made to the general verdict form in the proceedings below. See 264 F.3d at 106-07. As such, although we employ a reasonable certainty standard to determine whether Moore's retaliation claim was independently sufficient to support the jury's general damages award here, we emphasize that we are not foreclosing the consideration of an alternative test in future cases.

expressly rejected Moore's claim that he was "terminate[d] . . . because of his handicap." Such rejection plainly illustrates that the jury's conclusion Industrial retaliatorily terminated Moore did not rest on its determination that he "had a handicap." See Davis, 264 F.3d at 106.

With everything now said, we can advance and explain why the jury's retaliation verdict was appropriate whether Moore could reasonably qualify as handicapped or not. In obeisance to principles of federalism, it seems wise to leave it to the Commonwealth's courts to answer on another day the question whether a short-lived impairment such as Moore's could reasonably satisfy M.G.L. c. 151B's criteria. See, e.g., Roberge v. Travelers Prop. Cas. Co. of Am., 112 F.4th 45, 56 (1st Cir. 2024) (explaining that "federalism concerns and principles of prudence are at their peak when a federal case 'raises difficult questions of state law bearing on important matters of state policy'" (quoting Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 57 (1st Cir. 2023))).

B.   The Retaliation Verdict's Independent Sufficiency

Recall, the jury below found that Industrial retaliated against Moore by terminating him "for requesting or using a reasonable accommodation," in violation of M.G.L. c. 151B, § 4(4), which prohibits employers from "discharg[ing], expel[ling] or otherwise discriminat[ing] against any person because he has opposed any practices forbidden under this chapter or because he

- 20 -

has filed a complaint, testified or assisted in any proceeding under [M.G.L. c. 151B, § 5]." Industrial now before us argues that the record provided insufficient evidence to support the jury's decision on Moore's retaliation claim, for reasons we will explore momentarily. First, we pause to emphasize that Massachusetts antidiscrimination law treats retaliation as a "separate and independent cause of action" that does not require proof of a handicap. Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1087 (Mass. 2000). Instead, Moore's retaliation claim under the Commonwealth's law only required: (1) proof that he engaged in protected conduct; (2) proof that he suffered some adverse action; and (3) proof that some causal connection existed between the protected conduct and the adverse action. See Mole v. Univ. of Massachusetts, 814 N.E.2d 329, 338–39 (Mass. 2004); see also Tate v. Dep't of Mental Health, 645 N.E.2d 1159, 1165 (Mass. 1995) (describing an M.G.L. c. 151B retaliation claim's elements slightly differently, requiring proof that the plaintiff had a reasonable and good faith belief the defendant was engaged in wrongful discrimination, proof that the plaintiff acted reasonably in response to his belief, and proof that the defendant's desire to retaliate against the plaintiff was a determinative factor in its decision to impose an adverse employment action upon him).

Basic judicial principles in place, onto Industrial's arguments. The first requirement of Moore's retaliation claim under either formulation of the claim's elements related to whether his conduct was protected under the statute. See Mole, 814 N.E.2d at 338 n.13; see also Abramian, 731 N.E.2d at 1087. Industrial argues that Moore's requests for and use of an accommodation were unprotected as a matter of law because, considering his injury's short duration and its minimal-in-the-company's-eyes severity, he necessarily lacked a reasonable-good-faith belief he was actually entitled to an accommodation, which the company says his claim required. See Psy-Ed Corp., 947 N.E.2d at 529-30 (explaining that "a claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting [his] discrimination claim, the claimant can 'prove that [he] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination'" (quoting Abramian, 731 N.E.2d at 1087)). For reasons we will soon tell, you can color us unpersuaded.

Let's focus narrowly on Moore's requests for reasonable accommodation rather than his use of an accommodation to dissect his retaliation claim. See, e.g., United States v. Moran, 393 F.3d 1, 14-15 (1st Cir. 2004) (explaining that "when disjunctive theories are submitted to the jury [as here] and the jury renders a general verdict . . . as long as there was sufficient evidence to support one of the theories presented, then the verdict should

- 22 -

be affirmed" (citations and internal quotation marks omitted)). We reason it is prudent to place our concentration on Moore's accommodation requests to ascertain protected conduct because our court has previously held that a plaintiff's "requesting an accommodation [was] protected activity" sufficient to support a retaliation claim, Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003), in a case where the evidence was ultimately insufficient to allow a reasonable jury to find that the plaintiff was actually entitled to an accommodation under M.G.L. c. 151B, id. at 477. See also Abramian, 731 N.E.2d at 1087-88 (concluding that a plaintiff's reasonable opposition to conduct that he in good faith believed violated M.G.L. c. 151B, § 4(1), qualified as protected conduct supporting the jury's retaliation verdict under M.G.L. c. 151B, § 4(4), even though the conduct which the plaintiff opposed may not have actually violated the statute). In other words, Moore's requesting an accommodation from Industrial to allow him to continue working notwithstanding his injured hip and his opposing the company's accommodation request denials as they fell here could have reasonably qualified as protected conduct on the record before us whether Moore's hip injury could have reasonably qualified as a handicap or not. See Wright, 352 F.3d at 478; see also Psy-Ed Corp., 947 N.E.2d at 529-30; Abramian, 731 N.E.2d at 1087-88. Thus, we can take up the jury's finding indicating Industrial retaliated against Moore for requesting an

- 23 -

accommodation to guide our resolution of Industrial's appeal relative to Moore's retaliation claim. In doing so, we will first address the legal sufficiency of Moore's accommodation requests, and then we will advance to explore the good faith and reasonableness of Moore's belief he was entitled to an accommodation, as well as the reasonableness of his opposition against the company's accommodation-request responses.[17]

The law surrounding accommodation requests in the handicap discrimination context is fairly straightforward. See generally Stratton v. Bentley Univ., 113 F.4th 25, 52 (1st

_____

[17] It is not entirely clear whether, in order to establish protected conduct under M.G.L. c. 151B, an individual claiming retaliation based on an accommodation request must also show in addition: (1) that he reasonably and in good faith believed he was actually entitled to an accommodation; or (2) that he reasonably opposed his employer's denial of the accommodation request. See Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997) (explaining that, under the analogous ADA provision governing retaliation, "Congress intended . . . retaliation protection for employees who request a reasonable accommodation . . . [even if they do not] also file a formal charge" and even though they do not "literally oppose any act or practice [forbidden by the law]"); see also Wright, 352 F.3d at 474-75 (finding support for the plaintiff's retaliation claim under M.G.L. c. 151B without discussing whether the plaintiff had a reasonable-good-faith belief he was actually entitled to an accommodation and without identifying any reasonable opposition by the plaintiff against the accommodation request's denial). For our part as it concerns this case, we decline to comment on whether Moore was required to make a showing that he reasonably and in good faith believed he was entitled to an accommodation or to make a showing that he reasonably opposed Industrial's denial of his accommodation request -- however, to the extent that the Massachusetts law required a showing of either, we will explain in due time why a reasonable jury here could have found that Moore met the mark.

Cir. 2024). To suffice as an accommodation request, an employee who asserts that he has a handicap limiting his engagement in his job's functions must inform his employer about his limitations with "sufficient[] direct[ness] and specific[ity]," to give notice that he needs "special accommodation." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (citations omitted); see also Bos. Hous. Auth. v. Bridgewaters, 898 N.E.2d 848, 857-59 (Mass. 2009) (relying on Reed, 244 F.3d at 261, to evaluate whether a plaintiff's statements qualified as requests for accommodation in a housing discrimination matter also involving a claim under M.G.L. c. 151B); Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 271 (Mass. 2004) (examining evidence illustrating the sufficiency of an accommodation request in a handicap discrimination case under M.G.L. c. 151B).[18] At the least, the employee's request for

---

[18] We note that language in a footnote in Ocean Spray could be seen as indicating that, under M.G.L. c. 151B, a plaintiff's accommodation request must definitively establish that he is "entitled to" an accommodation to suffice. See 808 N.E.2d at 271 n.21 (stating that "for an employee's actions to constitute a request for accommodation, they must make the employer aware that the employee is entitled to and needs accommodation"). In view of that language from the Commonwealth's highest court, we emphasize that the SJC in Ocean Spray was narrowly analyzing a failure to accommodate claim, which required proof of a handicap, rather than a retaliation claim based on an accommodation request, which does not require such proof. Id. at 270; see Abramian, 731 N.E.2d at 1087; Wright, 352 F.3d at 478. Indeed, the SJC in Ocean Spray expressly stated that the only issue it was exploring relative to the plaintiff's accommodation request was whether the

- 25 -

accommodation must identify some desired accommodation and explain how the desired accommodation is linked to some handicap. See Reed, 244 F.3d at 261; see also Bridgewaters, 898 N.E.2d at 859 (explaining that "[t]o make a reasonable accommodation request, no 'magic' words are required"). And the employee's requested accommodation must appear reasonable on its face. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002); see also Reed, 244 F.3d at 259 (explaining that an accommodation request is facially reasonable when "at least on the face of things, it is feasible for the employer under the circumstances").

With the law in the backdrop, we can now display the evidence painting the picture which the jury viewed of Moore's accommodation requests. The record borne below depicted, among other things, that Moore suffered a hip injury; that he visited a physician to address the "severe pain" and other issues resulting therefrom; and that he thereafter told Industrial that he desired

_____

defendant-employer's response to the request illustrated that the plaintiff was being discriminated against "because of his handicap." 808 N.E.2d at 270. In that limited context, it made sense for the SJC to suggest that an accommodation request "must make the employer aware that the employee is entitled to . . . accommodation" to suffice to show that any mistreatment resulting from the request is based on the plaintiff's qualifying handicap. Id. at 271 n.21. That said, the SJC's narrow focus in Ocean Spray on whether the employer's accommodation-request-related conduct evinced discrimination "because of [a] handicap" distinguishes the case from cases like the one before us now, which focus on retaliation based on an accommodation request rather than focusing on discrimination based on a handicap. See, e.g., Wright, 352 F.3d at 478.

an accommodation, consistent with his physician's prescription, limiting his participation in heavy lifting and prolonged standing for at least the length of the workweek concluding on Saturday, December 14, 2019.  The record also illustrated further that COO Lydon, upon Moore's request, acknowledged his desired accommodation and assured him "whatever the doctor put[] on the note, that's what the restrictions need to be."  All good up to that point as Industrial respected Moore's request and the parameters of his limitations.  Then, as the record unraveled the events, on Friday the 13th, while Moore's accommodation was still in effect, Oberkramer demanded that he "get out of [his] machine[]" and "start working with [his] hands."  And when Moore resisted, reminding Oberkramer about the accommodation he had been granted by "the office" for his hip injury, and emphasizing that he was "not supposed to be bending over and picking up these pieces of heavy metal," Oberkramer exploded:  "I don't give an F about your doctor's note, I don't give an F what the office says. . . . Get the job done.  We need production.  Start working with your hands."  While Moore did as he was told at the time, as the record showed, when Moore was clocking out later that day, Oberkramer revived the conversation by telling Moore that he had been "jerking around all week in a machine" and suggesting that "[m]aybe [he] need[ed] to take some time off."  And, when Moore again reminded Oberkramer he

was "following [his] work restriction," Oberkramer, in retort, told him to "[h]it the gate and [not] come back."

A reasonable jury engaging with the above-identified evidence could have found that when Moore asked Oberkramer, while being demanded to "get out of [his] machine[]," to respect the accommodation he had earlier been granted by "the office" for his hip injury, and again later when Moore told Oberkramer that he desired to continue "following [his] work restriction" relative to his injury in response to Oberkramer's comment he "should come back at the first of the year," Moore twice satisfied the accommodation request rubric. See Reed, 244 F.3d at 261; see also Wright, 352 F.3d at 474-75 (outlining what qualified as an accommodation request on the case's record). Additionally, considering the same evidence, a reasonable jury could have fairly concluded that Moore reasonably and in good faith believed he was entitled to reasonable accommodation when he made his requests to Oberkramer, and, moreover, that he in the same way believed Oberkramer's conduct disregarding the requests violated M.G.L. c. 151B. See Abramian, 731 N.E.2d at 1087-88. Indeed, Industrial considered the severity and the expected duration of Moore's injury in nevertheless granting him an accommodation initially. And Oberkramer's subsequent about-face utterly disregarding the in-effect accommodation's outlined restrictions did not necessarily dispel any reasonable-good-faith belief Moore could

have possessed that he remained entitled to the accommodation: an accommodation which, we should mention, was feasible under the circumstances considering it had been in effect without any issues identified by Industrial for several days at the point of Moore's requests to Oberkramer. See Reed, 244 F.3d at 259. Ironically, Oberkramer's repeated refrain in response to both of Moore's relevant requests, "I don't give an F about what the office says," could have been understood by a reasonable jury as suggesting to Moore at the very least that given the office's acknowledgment of his physical limitations, some accommodation for him was needed. A reasonable jury looking at the noted evidence among other evidence could sensibly have found that Moore's requests for reasonable accommodation in response to Oberkramer's remarks and directives were based on a reasonable-good-faith belief that he was entitled to reasonable accommodation under M.G.L c. 151B. And, as for the reasonableness of Moore's opposition to the wrongdoing he perceived as manifest in Oberkramer's accommodation request denials, insofar as it is relevant to Moore's claim, see Tate, 645 N.E.2d at 1165, Industrial undertook no effort to explain to us how Moore's insisting that his in-effect accommodation be respected in opposition to Oberkramer's request-related conduct could be seen as unreasonable, and any argument on the subject is thus waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory

manner, unaccompanied by some effort at developed argumentation, are deemed waived").  Therefore, putting it all together at last, because a reasonable jury on this record could have found that Moore's requests for reasonable accommodation and his opposition as here against Oberkramer's accommodation-request denials were protected activities under M.G.L. c. 151B, there was sufficient evidence for the jury below to conclude that Moore satisfied the first requirement supporting his retaliation claim.  See Wright, 352 F.3d at 474-75; see also Reed, 244 F.3d at 261; Abramian, 731 N.E.2d at 1087–88.

    We forge ahead to the next requirement of Moore's retaliation claim: proof that Industrial's desire to retaliate against him for engaging in protected conduct was a determinative factor in its decision to take an adverse employment action against him.[19]  Tate, 645 N.E.2d at 1165.  Massachusetts courts have sometimes separated this requirement into two prongs: first considering whether the employee suffered an adverse employment action, and then considering the employer's motive for that action.

---

[19] The standard to show that protected conduct caused an adverse action in a retaliation claim under the ADA is distinct from the "determinative factor" standard required under M.G.L. c. 151B.  See Abramian, 731 N.E.2d at 1087 (quoting Tate, 645 N.E.2d at 1159) (setting forth the retaliation standard under Commonwealth law).  Under the ADA, unlike M.G.L. c. 151B, a "but-for causation standard controls whether a defendant is liable for retaliation."  Palmquist v. Shinseki, 689 F.3d 66, 77 (1st Cir. 2012).

- 30 -

See Mole, 814 N.E.2d at 338-39; Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 800 (Mass. 2016). Industrial asserts on appeal to us that Moore did not suffer any adverse action, so we will follow the outlined two-step approach.

An adverse employment action for purposes of M.G.L. c. 151B includes any action with effects on objective aspects of an employee's working terms, conditions, or privileges that "materially disadvantage[s] [the] employee." Yee v. Massachusetts State Police, 121 N.E.3d 155, 162 (Mass. 2019) (citing Psy-Ed Corp., 947 N.E.2d at 530). Massachusetts courts generally determine whether conduct produces an objective material disadvantage on a "case-by-case basis," "focus[ing] on a reasonable person in the employee's position." Id. Nevertheless, certain actions by employers, such as terminations, are adverse according to the statute. See Abramian, 731 N.E.2d at 1087 ("General Laws c. 151B, § 4(4), prohibits retaliation by making it unlawful for 'any person . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices' forbidden under G.L. c. 151B." (emphases added)). Both parties here agree that terminating Moore would have qualified as an adverse action. What Industrial asserts on appeal though is that contrary to the jury's determination, the evidence demonstrates that Moore was never terminated. To support its assertion, the company points primarily to the apparent lack of

- 31 -

clarity in Oberkramer's direction to Moore to "[h]it the gate," as well as to CEO Roberts' later phone call with Moore days after the hit-the-gate incident, wherein Roberts told Moore he was "welcome to stay" with the company if he would "just go and work it out with [Oberkramer]." In our review of Industrial's appeal, we will first address whether Oberkramer's directive to Moore could reasonably be seen by a jury as a termination of Moore's employment, and then we will move to address whether CEO Roberts' later statements to Moore relative to Oberkramer's directive affect our analysis of whether Moore was terminated by Industrial in the first instance.

To bolster its belief that Oberkramer's directives and conduct towards Moore could not have evinced a termination, Industrial emphasizes that Moore testified before the jury that Oberkramer "did not use th[e] words" "you are fired" when telling him: "[h]it the gate and don't come back." According to Industrial, because "Moore confirmed that he was never told that he was fired" by Oberkramer, a reasonable jury could not have concluded that the company terminated him. That is what Industrial says, but the law, for its part, tells us otherwise. The words "you're fired" were not required to show that Moore had been terminated, for reasons we will now explain. See, e.g., Edwards v. Commonwealth, 174 N.E.3d 1153, 1167 (Mass. 2021).

The SJC recently addressed a factually similar words-matter disagreement in a wrongful termination case under the Massachusetts whistleblower act. See Edwards, 174 N.E.3d at 1167; see also M.G.L. c. 149, § 185(a)(5). In Edwards, the SJC distinguished between situations where "a mere 'threat of discharge or discipline' meant that [an employee] was confronted with a 'difficult choice' about whether to resign," and situations where an employee was involuntarily terminated. Edwards, 174 N.E.3d at 1167 (citing Spencer v. Civil Serv. Comm'n, 93 N.E.3d 840, 850 (Mass. 2018)). Considering, among other things, testimony that Edwards had been told by her supervisor that the employer would "go in another direction," the SJC determined that a reasonable jury could conclude Edwards had been terminated rather than presented with a choice. Id. That case is instructive here.[20] As in Edwards, a reasonable jury in this case could have similarly concluded that when Moore was directed by Oberkramer to "[h]it the gate and [not] come back," he was being ordered to leave his position immediately and was not being presented with a difficult

_____

[20] After resolving the termination issue, the SJC in Edwards went on to explain that "[e]ven if the plaintiff had been offered a genuine choice between resignation and involuntary termination, that would [have] not necessarily foreclose[d] a showing that she had suffered an 'adverse employment action.'" 174 N.E.3d at 1167 (citing Yee, 121 N.E.3d at 162). That is so because an adverse employment action for purposes of M.G.L. c. 149, § 185(a)(5), like M.G.L. c. 151B, § 4(4), includes any action with "effects on working terms, conditions, or privileges" that "have materially disadvantaged an employee." Id.

choice.  Id.  Moore testified that Oberkramer had previously instructed employees "[h]it the gate and don't come back," and he explained to the jury that this familiar expression represented Oberkramer's version of "[y]ou're fired[!]" -- "because employees wouldn't come back [after that]."  The jury's decision to credit Moore's testimony indicating that Oberkramer's statements fell in line with how Industrial typically terminated employees was well within its purview; and the fact that Moore was never expressly "told that he was fired" by Oberkramer did not make the jury's conclusion that he was terminated unreasonable.  Id.

After arguing that a reasonable jury could not have found that Moore was terminated by Oberkramer, Industrial turns to the later conversation between Moore and CEO Roberts, which took place on December 17, 2019, some days after the hit-the-gate incident, to further support its idea that the company did not terminate Moore.  However, in doing so, Industrial does not explain how Roberts' statements subsequent to Moore's termination by Oberkramer should impact our analysis of the earlier termination. First of all, the company does not shed any light on how we should interpret Moore's testimony recounting that Roberts informed him during their conversation that "[Oberkramer] said that [he] was fired because [he] was talking about [his] wages," as support for the company's preferred factual inference that Moore was never terminated.  And, if after the chat about Moore's work status,

- 34 -

Roberts did not intend to "fire" Moore, the company does not identify any evidence that Roberts ever reached out to Moore to bring him back when it was apparent Oberkramer and Moore did not "work it out." In the same vein, the company does not point to any facts contradicting Moore's testimony suggesting that, considering "everything that's taken place on the job site," Roberts' expectation that he and Oberkramer could work things out was unreasonable. Therefore, given the state of the evidence presented by the company, a sensible jury could have concluded that CEO Roberts' overture to Moore that he was "welcome to stay" working for Industrial if he could just "work it out with [Oberkramer]" was nothing more than hollow talk. So, to put things briefly, without any argument from Industrial explaining why Oberkramer's termination of Moore could not suffice as an adverse action notwithstanding CEO Roberts' later comments, we conclude that the "adverse action" element of Moore's retaliation claim was satisfied by the record. See Edwards, 174 N.E.3d at 1167.

Regarding the next and final element of Moore's retaliation claim, proof of a forbidden motive animating the adverse action, while direct evidence of this final requirement is typically available only under incredible circumstances,[21] in this

---

[21] Given this general unavailability, Massachusetts courts usually look to federal law and employ the McDonnell Douglas burden-shifting framework to evaluate indirect evidence that bears

case, the jury possessed something akin to direct evidence that Moore was instructed to "[h]it the gate" because of his accommodation requests. See Lipchitz v. Raytheon Co., 751 N.E.2d 360, 367-68 (Mass. 2001) (explaining that "[i]f the employee [is] able to prove by direct evidence that discriminatory animus motivated the decision, she [does] not have to rely on the indirect method of proving animus"); see also Chief Just. for Admin. & Mgmt. of Trial Ct. v. Mass. Comm'n Against Discrimination, 791 N.E.2d 316, 321 n.11 (Mass. 2003) ("Direct evidence is evidence that, 'if believed, results in an . . . at least highly probable[] inference that a forbidden bias was present in the workplace.' Typically, direct evidence consists of statements of discriminatory intent attributable to an employer." (citations omitted)). That said, in its briefing before this court, Industrial did not assert a contention that the jury lacked a basis to find a retaliatory motive here. Instead, the company relied on its futile (for reasons we have just explained) theory that it did not take an adverse action against Moore to begin with. As such, any argument contradicting the jury's finding a discriminatory motive, by

_____

on an employer's intent. See Verdrager, 50 N.E.3d at 793; see also Theidon v. Harvard Univ., 948 F.3d 477, 505 (1st Cir. 2020) (outlining the McDonnell Douglas framework in the retaliation context and applying the framework to an M.G.L. c. 151B claim). The McDonnell Douglas framework is a three-step, burden-shifting test outlined by the Supreme Court which allows plaintiffs to prove a forbidden motive with indirect evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973).

direct evidence or otherwise, is waived.  See Zannino, 895 F.2d at 17.

Considering the evidence of retaliatory conduct we have limned and the argument bearing upon it; the record was sufficient to support the jury's conclusion that Moore suffered an adverse employment action for engaging in protected conduct.  The district court's denial of Industrial's motion for judgment as a matter of law considering Moore's retaliation claim is therefore affirmed, and the jury's general damages award is also affirmed too alongside.  See Wright, 352 F.3d at 478; see also Davis, 264 F.3d at 106.

## II.  The Rule 59(a) Arguments for a New Trial

Industrial Demolition next challenges the district court's denial of its request for a new trial.  The company urges this court to reverse the district court's decision based on alleged substantive and procedural errors during the jury instruction process.

Rule 59(a) extends a district court's authority to grant a new trial "much [more] broad[ly] than its power to grant a [motion for judgment as a matter of law]."  Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009).  The Rule authorizes a district court to "set aside the jury's verdict and order a new trial . . . if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of

justice." Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006). "The trial judge, [when] considering [a] motion for a new trial, may consider the credibility of the witnesses who had testified and, of course, will consider the weight of the evidence." MacQuarrie v. Howard Johnson Co., 877 F.2d 126, 132 (1st Cir. 1989). We review "the district court's disposition of a new trial motion for abuse of discretion." Ira Green, Inc. v. Mil. Sales & Serv. Co., 775 F.3d 12, 18 (1st Cir. 2014).

Industrial Demolition essentially alleges that the district court engaged in judicial misconduct, thereby committing reversible errors on the fourth day of trial, April 14, 2023, during the jury deliberation process. Here's what occurred. The district court concluded its final instructions to the jury that day by stating: "And if any of you have a question, please let the person [who is securing you] know and we will reassemble here, and if I can answer the question in writing, I will do that." The jury then began its deliberations at approximately 11:15 a.m. Around 1:00 p.m., the jury submitted the following question to the court: Can you provide the definition of handicap? At 1:05 p.m., Moore's counsel entered the courtroom, along with the courtroom clerk and the court reporter. The judge was not present at this time and Industrial Demolition's counsel was still en route to the courtroom. The clerk then opted to read into the record outside

of the jury's presence the court's proposed answer to the jury's question, saying:

> I'm just going to read this in. This is the answer the judge gave. In this case, handicapped under the law means an actual physical impairment which substantially limits one or more major life activities. Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. An actual physical impairment substantially limits an individual's ability to work if it prevents or significantly restricts the individual from performing a class of jobs or broad range of jobs in various classes.

Moore's attorneys indicated agreement with that definition. Industrial Demolition's counsel entered the courtroom at 1:08 p.m. and began reviewing the jury's question and the court's proposed answer. The company's counsel then objected to the substance of the proposal, noting that the court's proposed definition lacked additional language defining the term "substantially limits" which was included in the earlier oral instructions -- language which stated that "the determination of whether an individual is substantially limited in a major life activity depends on, one, the nature and severity of the impairment; two, the duration or expected duration of the impairment; and three, the permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment." Counsel also lodged a procedural objection,

complaining that a response to the jury's question had been prepared without his input and that substantive discussions had occurred outside of his presence.

A short time later, at 1:50 p.m., the district court judge entered the courtroom and began to hear from the parties. Industrial Demolition's counsel again objected on the record, indicating his belief that substantive discussions had occurred outside of his presence, and explaining his position that the definition of handicap given to the jury was legally insufficient. The court then entertained arguments from both parties about the definition. At 2:02 p.m., after hearing from both sides, the court said:

> I think what I will do is send to the jury the proposed response that you have seen and [the courtroom clerk] will take it to them, ask them to read it, and ask them whether that satisfies the question that they put to us. If it doesn't satisfy, then they can ask us what else they need to know in order to be able to answer the question that is posed to them in the jury verdict.

Following the court's comment, the proposed response that the courtroom clerk read into the record at 1:05 p.m. was thus sent to the jury. The jury reported it was satisfied with the response and therefore, no additional instructions were delivered.

Now on appeal, Industrial offers two primary arguments. In doing so, the company does not meaningfully reprise its argument

- 40 -

that the district court committed legal error by communicating with Moore's counsel outside of its presence. That argument is therefore waived. See Zannino, 895 F.2d at 17. In its stead, the company premieres a new argument that was not presented to the district court until its post-trial Rule 59 motion, asserting that the court erred by actually answering the jury's question before Industrial's counsel had the opportunity to be heard. Even if we deem that argument timely raised, the record as outlined above clearly indicates that such conduct never occurred. See, e.g., Kattan by Thomas v. D.C., 995 F.2d 274, 276 (D.C. Cir. 1993), as amended (June 30, 1993) ("In analogous circumstances, this Court has recognized that a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously."). Though the district court may have formulated a tentative response to the jury's question before hearing from counsel, it clearly entertained input from both sides before making a final decision.

The company's remaining asseveration reprises its argument that the district court erred by providing an insufficient definition of the term handicap in response to the jury's question. That contention also fails. Industrial's argument boils down to its disagreement with the court's refusal to repeat an instruction defining substantial limitation already given to the jury prior to the start of deliberations. Yet it provides no authority supporting the idea that such a refusal constitutes legal error

- 41 -

amounting to an abuse of discretion.  See Testa v. Walmart Stores, Inc., 144 F.3d 173, 176 (1st Cir. 1998) (concluding under similar circumstances that "nothing in the circumstances of th[e] case . . . compelled the judge to [repeat his earlier instruction]"); see also Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998) (emphasizing that "within wide limits, the method and manner in which the judge carries out [their] obligation [to inform the jury about the applicable law] is left to [their] discretion").  Indeed, the district court provided the jury what it asked for -- the definition of handicap, not substantial limitation.  Testa, 144 F.3d at 176 ("[W]hen a jury question is received during deliberations, the judge must address only those matters fairly encompassed within the question.").  Therefore, the district court committed no error, and the court's denial of Industrial Demolition's motion for a new trial is affirmed.[22]

### III. The Arguments for a Remittitur

Industrial advances a couple of arguments in support of its remittitur claims.  It first says that the evidence presented to the jury necessarily showed that Moore failed to make reasonable

---

[22] Even if this court were to assume that the district court erred in instructing the jury as to the definition of "handicap," such error would still not merit reversal on the record before us, as the jury's handicap finding did not ultimately affect its damages verdict -- as we have previously explained at length.  See Romano v. U-Haul Int'l, 233 F.3d 655, 665 (1st Cir. 2000) ("We will not, then, reverse a judgment if the error that resulted from the incorrect instruction was harmless.").

efforts to secure new employment, and the company insists that Moore's back pay should have been reduced accordingly -- to zero. Second, the company points out that its work on Brayton Point ended on August 14, 2020, and it contends that there was therefore no basis for the jury to award Moore back pay for any period after that date. We take each argument in turn, reviewing the district court's decision on the motion for a remittitur for abuse of discretion. See Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 29 (1st Cir. 2012).

Industrial first asserts that there was insufficient evidence for the jury to conclude that Moore was entitled to any back pay when he "removed himself" from the labor market at the conclusion of his employment with the company; and it argues that the company is therefore entitled to a remittitur on that basis. "An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment." Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 379 (1st Cir. 2004). "During the back pay period, [however,] individuals have an obligation to exercise 'reasonable diligence' in finding alternative suitable employment." Id. Considering that obligation, an award of back pay will typically be "offset by any wages that could have been earned with reasonable diligence after the illegal discharge, regardless of whether they were actually earned." Id. A district court has discretion to order

a remittitur to address improper back pay calculations "if such an action is warranted in light of the evidence adduced at trial." Trainor, 699 F.3d at 29. "In exercising [that] discretion, [a district] court is obliged to impose a remittitur 'only when the [jury's] award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" Id. (quoting Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003)).

In asserting that Moore "removed himself" from the labor market following his employment with the company, Industrial essentially argues that Moore failed to exercise reasonable diligence to find alternative suitable employment after he was terminated. See Johnson, 364 F.3d at 379. The SJC has helpfully explained that, under Massachusetts law, the burden of proof to show a failure to exercise reasonable diligence lies with the employer. McKenna v. Comm'r of Mental Health, 199 N.E.2d 686, 688 (Mass. 1964). Moreover, the SJC has emphasized that evidence a terminated employee "had not applied for any . . . positions during the time []he was not employed by the [defendant] . . . alone . . . is not sufficient" to meet that burden. Ryan v. Superintendent of Sch. of Quincy, 373 N.E.2d 1178, 1182 (Mass. 1978). Additionally, an employer arguing that a discharged employee failed to appropriately mitigate damages is required to show what amount an employee "could have earned in other similar work[,]" McKenna, 199 N.E.2d at 689, and that

substantially equivalent jobs were available in the relevant geographic area, see Black v. Sch. Comm. of Malden, 341 N.E.2d 896, 900 (Mass. 1976) (outlining when "[a] former employer meets its burden of proof of 'mitigation of damages'").

Let us review the evidence relative to Industrial's burden to prove Moore failed to exercise reasonable diligence to find alternative suitable employment. Moore testified that Industrial Demolition discharged him on December 13, 2019, after the altercation with Oberkramer about his work restrictions. He told the jury that he left Massachusetts and moved to Indiana soon thereafter. That next month, on January 20, 2020, the first case of the COVID-19 coronavirus was reported in the United States. See Michelle L. Holshue, et al., First Case of 2019 Novel Coronavirus in the United States, 382 N. Engl. J. Med. 929 (2020). Bearing in mind that global pandemic backdrop, Moore testified that he did not seek employment for several months after leaving Massachusetts, from January 2020 to April 2020, as "there [were] a lot of things happening in the world at that time" and "[f]inding a job was pretty difficult." Nevertheless, he stated that by the middle of 2021, he had secured a full-time job in Somerset, Kentucky.

For its part corresponding to its burden, the record illustrates that Industrial never made any meaningful attempt to properly show that Moore failed to make reasonable efforts to find

- 45 -

alternative suitable employment.[23]  See Ryan, 373 N.E.2d at 1182; Sch. Comm. of Malden, 341 N.E.2d at 900.  For example, Industrial did not offer evidence that there were substantially equivalent jobs in or near Somerset, Massachusetts, at the time of Moore's termination, nor did it demonstrate what Moore could have earned in similar work.  The company's first remittitur argument asserting that Moore failed to exercise reasonable diligence in seeking alternative suitable employment therefore fails.

Regarding Industrial Demolition's last-gasp alternative argument that because the company's work on Brayton Point ended in August of 2020, Moore could not have been entitled to back pay after that date, we find it unpersuasive.  The company's reasoning falters because the record does not show that Moore's employment

---

[23] The company's averment to CEO Roberts' statement indicating that Moore was invited to move forward working with Industrial if he could just "work it out" with Oberkramer could have been sensibly framed by the company on this record as an argument that Moore failed to mitigate damages by declining CEO Roberts' offer of re-employment.  See, e.g., Sherman v. Sch. Comm. of Whitman, 522 N.E.2d 433, 435 (Mass. App. Ct. 1988) (exploring a claim that the plaintiff-employee failed to mitigate damages by declining a reinstatement offer after being terminated); see also Ford Motor Co. v. EEOC, 458 U.S. 219, 232 (1982) (explaining that "an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages").  That being said, because the company did not argue below nor before us that Moore's conversation with CEO Roberts should affect the mitigation analysis, we limit our discussion in this case to addressing the company's mitigation arguments which it presents to us here.  See Zannino, 895 F.2d at 17.

with Industrial would have necessarily ended at that time.  Recall that Moore, who had previously worked for Industrial Demolition at the Tanner's Creek site until the conclusion of its project there, had demonstrated a willingness to relocate with Industrial to where the work could be found.  He moved himself (and his family) to Massachusetts to work on the Brayton Point project, in spite of his displeasure with Industrial's disregard for safety protocols and notwithstanding his antipathy towards Oberkramer's management skills.  And Moore told the jury that, prior to his discharge, he "figured [he would] be working [for Industrial] probably another ten years," noting that he had been "promised a raise at the next job site."  Considering that evidence, and as the jury found, the record does not support Industrial's preferred inference that Moore would have stopped working for Industrial at the conclusion of the Brayton Point project.  The district court's denial of the company's motion for a remittitur is therefore affirmed.

## MOORE'S ARGUMENTS ON APPEAL

Having addressed Industrial Demolition's requests for relief and affirmed each of the district court's decisions, we now turn to Moore's appeal from the district court's denial of his motion to amend the judgment and his motion for a new trial.

### I.   The Motion to Amend the Judgment

Moore believes that the district court erred when it permitted the jury to consider the earlier settlement between him

and Industrial Demolition, which arose from his successful NLRB grievance, by instructing the jury to deduct from the final damages award the settlement's value. According to Moore, the settlement was collateral source income which should have been excluded from the jury's consideration as a matter of law.[24] We review the district court's denial of Moore's motion to alter or amend the judgment on that basis for abuse of discretion. See Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 32 (1st Cir. 2012); see also Negron-Almeda v. Santiago, 528 F.3d 15, 25 (1st Cir. 2008) ("[A] court's material error of law is invariably an abuse of its discretion.").

The collateral source rule has traditionally provided "that benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." Lussier v. Runyon, 50 F.3d 1103, 1107 (1st Cir. 1995) (quoting 1 Dan B. Dobbs, Law of Remedies § 3.8(1), at 372-73 (2d ed. 1993)). As for its operation, it "has both a substantive aspect that relates to the law of damages, and an evidentiary component that governs what types of evidence may be admitted in evidence at trial." Law v. Griffith, 930 N.E.2d 126,

---

[24] Industrial Demolition says that Moore waived his collateral source argument by agreeing to deduct the NLRB settlement from any damages award. While Moore did agree that the district court could, post-verdict, consider a remittitur to address the settlement, he did not agree to deduct the settlement or to introduce evidence of the settlement to the jury.

132 (Mass. 2010). Where, as here, an appellant asserts that the district court was legally incorrect in its application of the rule in calculating damages, the appellant mounts a substantive challenge which is appropriately analyzed under Massachusetts law. See McInnis v. A.M.F., Inc., 765 F.2d 240, 245 (1st Cir. 1985) ("In spite of the general applicability of the Federal Rules of Evidence to diversity actions, it is well recognized that Congress did not intend the rules to preempt so-called 'substantive' state rules of evidence such as the parole evidence rule, the collateral source rule, or the Statute of Frauds."). Under Massachusetts law, the collateral source rule provides that "the value . . . an injured plaintiff would be entitled to recover from [a] tortfeasor as a component of her compensatory damages . . . is not to be reduced by any insurance payments or other compensation received from third parties by or on behalf of the injured person." Griffith, 930 N.E.2d at 131.

The problem with Moore's collateral source argument is that he fails to explain why the payment he received directly from Industrial via the settlement implicates the Commonwealth's rule in any way. See id. (emphasizing that the collateral source rule traditionally applies to compensation received from third parties); Goldstein v. Gontarz, 309 N.E.2d 196, 202-03 (Mass. 1974) (cataloguing SJC and Supreme Court cases where a payment has been considered collateral); N.L.R.B. v.

Gullett Gin Co., 340 U.S. 361, 364 (1951) (distinguishing direct and collateral source income). On its face, a settlement paid by an accused party as a result of a process supervised by the NLRB is different from the "fringe benefits" that Massachusetts courts have typically categorized as collateral, like insurance policies, unemployment benefits, and workers compensation. See Goldstein, 309 N.E.2d at 202-03. That collateral class of compensation has traditionally been limited to third-party payments that "[are] not made to discharge any liability or obligation of [the tortfeasor]," and which flow indirectly to the plaintiff from insurers or from programs using state funds derived from taxation. See Gullett Gin, 340 U.S. at 364. Reducing a damages award to account for that collateral class of income would usually produce an unjust profit for the tortfeasor, which the collateral source rule guards against. See Griffith, 930 N.E.2d at 132 (explaining that "it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor" (quoting Restatement (Second) of Torts § 920A, Comment b (1979))).

While application of the collateral source rule is typically limited to that class of third-party payments, courts, including Massachusetts courts, have recognized exceptions, and have found, in certain instances, payments by a defendant to be subject to the collateral source doctrine, such as where the

payments should be considered in the nature of a fringe benefit or deferred compensation. See, e.g., Short v. Marinas USA Ltd. P'ship, 942 N.E.2d 197, 207 n.12 (Mass. App. Ct. 2011) ("When evaluating whether a source is collateral, our determination depends upon the purpose and nature of the payments and not merely their source." (cleaned up)); see also Falconer v. Penn Mar., Inc., 397 F. Supp. 2d 144, 147-48 (D. Me. 2005) (explaining that the collateral source rule "usually" does not apply when the source of the payment is the defendant while noting that circumstances exist where "the character of the benefits" nevertheless may merit application of the rule to a culpable defendant); Davis v. Odeco, Inc., 18 F.3d 1237, 1245 (5th Cir. 1994) (concluding that payments from an insurance plan funded primarily by the defendant-employer were in the nature of a fringe benefit and thus subject to the collateral source rule).

Having in mind those principles which animate the concerns that the collateral source rule operates to address, we reiterate -- Moore never explains how the NLRB settlement payment, one which came directly from Industrial Demolition itself and not some third party, and which specifically compensated him for back and front pay, touches upon collateral source jurisprudence. See Short, 942 N.E.2d at 207 (explaining that applications of the collateral source rule which would result in "a windfall to the plaintiff from a noncollateral source" are disfavored). Nor does

he ever explicate why the NLRB settlement payment from Industrial is an exception meriting departure from courts' usual practice of not applying the collateral source rule when the source of the payment is the defendant. See Bunker Hill Ins. Co. v. G.A. Williams & Sons, Inc., 116 N.E.3d 47, 53 n.10 (Mass. App. Ct. 2018) (citing Russo v. Matson Nav. Co, 486 F.2d 1018, 1020 (9th Cir. 1973) (recognizing the broad rule that where the plaintiff receives from the tortfeasor payments to compensate for his injury, the tortfeasor need not pay twice for the same damage); see also Falconer, 397 F. Supp. 2d at 147-48. What we get instead is Moore endeavoring to complicate the collateral source rule by arguing, without citation to relevant authority,[25] that the settlement payment should be excluded under the rule because the payment compensated him for distinct injuries inflicted upon him by Industrial related to unfair labor practices and unrelated to his causes of action before the court. Specifically, Moore says the NLRB investigated Industrial "for preventing employees from discussing their wages and for retaliating against those employees who do so," and that it did not investigate Industrial for engaging in handicap discrimination or retaliation. Okay. But even if

---

[25] Moore attempts to support his proposition with cites to Jones v. Cincinnati, Inc., 589 N.E.2d 335 (Mass. App. Ct. 1992), and Goldstein, 309 N.E.2d 196, but both are inapposite as neither involves a direct payment made to a plaintiff-employee from a defendant-employer.

that assertion may be true, it is not an argument which tells us why the settlement payment qualifies as excludable collateral source income; and it ignores the fact that the payment prompted by the NLRB proceeding was precisely calculated by reference to lost wages.

Bottom line, while Moore's collateral source argument is likely waived for lack of adequate development, see Zannino, 895 F.2d at 17, with no reasoned explanation in support of his argument, we cannot conclude the district court's decision permitting the jury to consider and instructing it to deduct the settlement payment from its ultimate damages award was error and thus an abuse of discretion. So, the district court's denial of Moore's motion for an amended judgment is affirmed.

## II. The Motion for a New Trial on Punitive Damages

The light at the end of the tunnel nears. Our last task is to address Moore's belief that he is entitled to a new trial on the limited question of punitive damages. He argues that the district court erred when it rejected his request to present the punitive damages question to the jury and when it denied his motion for a new trial on the issue.

A district court may grant a motion for a new trial "only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." Sánchez v. Foley, 972 F.3d 1, 16 (1st Cir. 2020) (citations and

internal quotation marks omitted); Fed. R. Civ. P. 59(a). We review a district court's decision on the motion for abuse of discretion. Sánchez, 972 F.3d at 16.

The availability of punitive damages is a substantive issue, so again, we turn to Massachusetts law to apprise the district court's decision. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 428 (1996). Under Massachusetts law, punitive damages are generally appropriate "where a defendant's conduct warrants condemnation and deterrence." Bain v. City of Springfield, 678 N.E.2d 155, 161-62 (Mass. 1997). Massachusetts has traditionally identified the broad circumstances warranting such condemnation and deterrence by statutorily authorizing punitive damages for certain causes of action. See Aleo v. SLB Toys USA, Inc., 995 N.E.2d 740, 753 (Mass. 2013). M.G.L. c. 151B, at issue here, is one of those Massachusetts statutes which specifically expresses that "[i]f the court finds for the petitioner, it may award the petitioner actual and punitive damages." M.G.L. c. 151B, § 9. The decision whether punitive damages are appropriate in a particular M.G.L. c. 151B case depends on "common law and constitutional principles," Dartt, 691 N.E.2d at 536, and punitive damages are typically warranted only for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others," id. (citing the Restatement (Second) of Torts § 908(2) (1979); see Haddad v.

<u>Wal-Mart Stores, Inc.</u>, 914 N.E.2d 59, 74 (Mass. 2009) ("While discrimination of all types is wrong and unacceptable, certain discriminatory conduct is more outrageous than others. Punitive damages have been, and remain, permissible only where the defendant's behavior is particularly outrageous or egregious.").

The SJC has provided guidance explaining how to identify outrageous or egregious conduct warranting the imposition of punitive damages in the M.G.L. c. 151B context. <u>Haddad</u>, 914 N.E.2d at 63. "In determining whether the defendant's conduct was so outrageous or egregious that punitive damages . . . are warranted, the fact finder should consider all of the factors surrounding the wrongful conduct." <u>Id.</u> at 75.[26] Additionally, the SJC has further explained that for an employer to be held liable for the outrageous or egregious conduct of a lower-level supervisor, the employer must have knowledge of the conduct and fail to take corrective action. <u>Gyulakian</u> v. <u>Lexus of Watertown, Inc.</u>, 56 N.E.3d 785, 794

---

[26] The SJC identified five such non-exclusive factors courts may consider, including: (1) whether there was a conscious or purposeful effort to demean or dimmish the class of which the plaintiff is a part; (2) whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood harm would arise; (3) the actual harm to the plaintiff; (4) the defendant's conduct after learning that the initial conduct would likely cause harm; and (5) the duration of the wrongful conduct and any concealment of that conduct by the defendant. <u>Haddad</u>, 914 N.E.2d at 75. The SJC stated that "[j]udges can look to these factors for guidance, and should tailor jury instructions in a particular case by selecting from among the suggested factors as warranted by the evidence." <u>Id.</u>

(Mass. 2016); Merrimack Coll. v. KPMG LLP, 108 N.E.3d 430, 443 (Mass. 2018); see Tryon v. Mass. Bay Transp. Auth., 159 N.E.3d 177, 189 n.12 (Mass. App. Ct. 2020) (discussing the "Gyulakian and Merrimack College . . . standard"). An employer's failure to take corrective action to address known discrimination is the outrageous or egregious conduct on the part of the employer warranting the imposition of punitive damages. Gyulakian, 56 N.E.3d at 796-97 (citing Haddad, 914 N.E.2d at 73).

In the case at hand, when confronted by Moore's counsel about a potential punitive damages question for the jury's consideration, the district court judge did not tailor jury instructions by selecting from the factors suggested in Haddad, 914 N.E.2d at 75, nor did she discuss the "Gyulakian and Merrimack College . . . standard," Tryon, 159 N.E.3d at 189 n.12. Instead, the court cursorily stated, "we've heard all the evidence, and I don't think the evidence [for punitive damages] is there." Moore's counsel offered a "strong objection to the exclusion of punitive damages without . . . any consideration of the applicable Massachusetts law," but to no avail. And the district court did not expand upon its reasoning in its later decision denying Moore's motion for a new trial on the punitive damages question.

While a district court, in general, should proceed with caution when performing its gatekeeper function in evaluating a punitive damages charge request under M.G.L. c. 151B, we believe

- 56 -

the district court acted within its discretion in this case. But see Haddad, 914 N.E.2d at 72 ("An award of punitive damages [typically] requires a determination of the defendant's intent or state of mind, determinations properly left to the jury."); Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 858 (Mass. 1997) ("We start with the proposition that taking [certain] question[s] out of the jury's hands is disfavored in the context of discrimination cases."). We espy no discretionary abuse because our review of the record suggests that had the district court properly applied Haddad, 914 N.E.2d 59, Gyulakian, 56 N.E.3d 785, and Merrimack Coll., 108 N.E.3d 430, to assess Moore's argument and explicated its reasoning, a reasonable jury could not have fairly concluded that Industrial's behavior complained of here warranted punitive damages. See, e.g., Smith v. Bell Atl., 829 N.E.2d 228, 245 (2005) (a pre-Haddad case affirming a trial court's decision to withhold the punitive damages question from the jury); Kiely v. Teradyne, Inc., 13 N.E.3d 615, 620 (Mass. 2014) (a post-Haddad case affirming a trial court judge's vacatur of a jury's punitive damages award).[27]

---

[27] While evidence was presented suggesting Industrial operated an unsavory workplace -- think highly unsafe work environment as per OSHA and inappropriate use of derogatory language -- the behavior we focus on when evaluating Moore's punitive damages claim of error is Industrial's discriminatory and retaliatory conduct with a nexus to Moore's injuries. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422 (2003) ("A defendant's dissimilar [conduct], independent from the [wrongful conduct] upon which liability was premised, may not serve as the basis for

Considering Moore sought to hold Industrial, his past employer, liable for punitive damages based on his then-supervisor Oberkramer's conduct, the district court was tasked to look beyond Oberkramer to determine whether members of senior management were aware of the complained-of-disability-based discrimination.  See Gyulakian, 56 N.E.3d at 795 (explaining that "[p]unitive damages are intended to fulfil a prophylactic purpose, and serve little benefit when imposed on an employer for the actions of a supervisory employee where that supervisor's discriminatory transgressions were unknown to the employer"); see also Merrimack Coll., 108 N.E.3d at 443 ("To support an award of punitive damages, a jury must find the employer itself to be morally blameworthy, and that requires a finding that a member of the employer's senior management was morally blameworthy.").  If members of senior management were shown to be aware, the district court could have only then moved forward to consider whether senior management participated in the misconduct or acquiesced in it by knowing of

punitive damages.").  The Supreme Court has cautioned that "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory . . . business." Id. at 423. And the SJC has also indicated "that a supervisor's creation of a[n] . . . [unlawful] work environment alone is [not] sufficient to warrant the imposition of punitive damages on the employer." Gyulakian, 56 N.E.3d at 795.  Here, since the issue upon which we reject Moore's claim -- that of the employer's lack of notice (which we discuss next) -- is dispositive, we need not opine on whether Oberkramer's conduct, if known and ignored by Industrial, would have been outrageous and egregious enough to warrant a punitive damages charge.

it and failing to provide a remedy -- thus rendering Industrial liable for punitive damages. Gyulakian, 56 N.E.3d at 796.

In this case, however, while Moore presented evidence that members of senior management, namely CEO Roberts and COO Lydon, were put on notice of Oberkramer's discriminatory conduct after he was terminated, along with evidence that senior management failed to act to remedy the discrimination subsequently, Moore also testified that until he spoke with Roberts about Oberkramer's abusive workplace conduct following his termination, senior management "had probably absolutely no idea" about the conditions on site. See Gyulakian, 56 N.E.3d at 796 (emphasizing that there was sufficient evidence for the jury to find that members of senior management were "on notice of the sexually harassing conduct of its employee . . . well before [the plaintiff] was terminated"). Consistent with that testimony, CEO Roberts stated that he had received no earlier complaints about Oberkramer and his conduct prior to Moore's discharge. And Moore fails to identify any point in the record that rebuts either statement or that otherwise indicates that senior management was on notice of Oberkramer's unlawful conduct prior to the day Oberkramer terminated his employment.[28] If Moore had shown that members of senior management,

---

[28] Additionally, we note that there is no evidence indicating Roberts believed that Moore tried to work it out with Oberkramer and was rebuffed. In other words, as far as Roberts was aware, he

for example, had been made aware of Oberkramer's hostile reactions toward requests for accommodation at some point in time prior to the moment he was terminated, Moore may have been able to prove his claim for punitive damages. Here, however, instead of that sort of evidence, Moore presented evidence showing senior management's knowledge of Oberkramer's conduct after Oberkramer terminated his employment, along with a conclusory legal argument that punitive damages should always be considered in cases involving the intentional tort of retaliation. That legal argument, however, has already been considered and rejected by the SJC. See Haddad, 914 N.E.2d at 63 (explaining that intentional discrimination alone is not sufficient to warrant the imposition of punitive damages). And, as we have explained, the district court's assessment that senior management's post hoc knowledge of Oberkramer's conduct was insufficient to warrant the imposition of punitive damages on the company was not an abuse of discretion. See Gyulakian, 56 N.E.3d at 796.

We affirm the district court's denial of Moore's motion for a new trial on the issue.

### THE OUTCOME

The district court's verdict is affirmed. Each party shall bear its own costs.

---

had given Moore the ability to continue his employment with the company.